**TWIN FALLS SALMON RIVER LAND & WATER CO. et al. v. CALDWELL et al.**

(Circuit Court of Appeals, Ninth Circuit. March 9, 1921. On Petition for Rehearing, May 9, 1921.)

No. 3502.

1. Waters and water courses ⬅247(1)—New pleadings made necessary by matters arising after filing of bill.

Where, since the commencement of a suit by the settlers on lands within an irrigation project under the Carey Act (Comp. St. § 4685), to determine their water rights under their contracts with the construction company, new and material questions have arisen, not within the issues, by reason of the action of the state board of land commissioners in excluding the lands of some of complainants from the project and including the lands of others, making the interests of such two classes of complainants antagonistic and by the action of the Commissioner of the General Land Office in issuing patents to the state for some of the lands, involving a

finding that such lands were supplied with sufficient water for their reclamation, a realignment of parties and new pleadings *held* necessary before the rights of the parties can be adjudicated.

### On Petition for Rehearing.

2. **Waters and water courses** ⏤222—Cost of change in irrigation system held chargeable to construction and not maintenance.

Where a natural basin, 90 acres in area, originally utilized as a part of the canal of an irrigation system constructed by a company pursuant to a contract with the state under the Carey Act (Comp. St. § 4685), proved in use to be wasteful because of leakage through holes in the bottom, and evaporation, and after a number of years a canal was built across it, the cost of such canal *held* a construction cost, to be borne by the company under its contract, and not a maintenance charge, which could be assessed against the water users.

Appeal from the District Court of the United States for the Southern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit in equity by A. E. Caldwell and others, in behalf of themselves and all persons similarly situated, against the Twin Falls Salmon River Land & Water Company and others. Decree for complainants, and defendants appeal. Reversed in part, and remanded.

Richards & Haga, S. H. Hays, and P. B. Carter, all of Boise, Idaho, and A. N. Edwards, of St. Louis, Mo., for appellants.

James R. Bothwell, of Twin Falls, Idaho, Sullivan & Sullivan, of Boise, Idaho, and Turner K. Hackman, of Twin Falls, Idaho, for appellees.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge. This controversy was before this court in Twin Falls Salmon River Land & Water Co. v. Caldwell, 242 Fed. 177, 155 C. C. A. 17. It relates to transactions connected with a project for the reclamation of certain desert lands in the state of Idaho under the so-called Carey Act (section 4 of the Act of August 18, 1894, 28 Stat. 422), as amended by the Act of June 11, 1896 (29 Stat. 434, [Comp. St. § 4685]), and the Act of March 3, 1901 (31 Stat. 1188 [Comp. St. § 4687]), and the Act of the Legislature of the state of Idaho approved March 9, 1895 (Session Laws of 1895, p. 219), re-enacted in 1899 (Laws of 1899, p. 282) and re-enacted and codified in Revised Codes of 1908 (sections 1613-1634), and more recently compiled in Statutes of 1919 (sections 2996-3074).

The relation of the federal government to the state government in the reclamation of desert lands arises out of the fact that the federal government owns the lands, and Congress is invested by the Constitution with the power of disposing of the same, while the state has been given jurisdiction to provide for the appropriation and beneficial use of the waters of the state which necessarily includes a use for the reclamation of such lands. In Gibson v. Chouteau, 13 Wall. 92-99 (20 L. Ed. 534), the Supreme Court of the United States said:

"With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations. Congress has the absolute right to pre-

scribe the times, the conditions, and the mode of transferring this property, or any part of it, and to designate the persons to whom the transfer shall be made."

In U. S. v. Hanson, 167 Fed. 881–884, 93 C. C. A. 371, this court held that this right extended to the withdrawal of land by the Secretary of the Interior under the Irrigation Act of June 17, 1902 (32 Stat. 388 [Comp. St. §§ 4700–4708]), which land prior to that act had been taken possession of and occupied by a settler and resided upon by him continuously with the intent to file a homestead entry thereon under the laws of the United States when the lands should be surveyed and opened to entry. This was a possessory right under section 3, Act of May 14, 1880 (21 Stat. 141), but a right which had to yield to the superior right of Congress to prescribe the times, the conditions, and the mode of transferring such property or any part of it and to designate the persons to whom the transfer should be made.

The absolute power of Congress over the public domain as thus defined requires that the court should carefully scrutinize the acts of Congress providing for the grant of desert lands to the states, that we may understand the conditions and limitations upon which the grant was made. The first observation to be made with respect to the Carey Act is that its purpose was to aid the public land states in the reclamation of the desert lands in such states. Without such reclamation such lands are obviously unfit for settlement, cultivation, or sale. The states having jurisdiction to provide for the appropriation and beneficial use of the waters of the state for that purpose are invited by the act to co-operate with the United States in such a plan, and to that end such states are authorized to apply to the Secretary of the Interior for such desert lands, not exceeding 1,000,000 acres in each state, as the state may cause to be irrigated, reclaimed, and occupied. Upon such a proper application the Secretary of the Interior, with the approval of the President, is authorized and empowered to contract and agree from time to time with each of the states to bind the United States to convey, grant, and patent to the state free of cost for survey and price for such desert lands. But before the application of any state is allowed or any contract or agreement is executed or any segregation of any of the lands from the public domain is ordered by the Secretary of the Interior, the state shall file a map of the said lands proposed to be irrigated and shall exhibit a plan showing the mode of the contemplated irrigation and which plan shall be sufficient to thoroughly irrigate and reclaim said land and prepare it to raise ordinary agricultural crops, and shall also show the source of the water to be used for irrigation and reclamation, and the Secretary of the Interior is authorized to make necessary regulations for the reservation of the lands applied for by the states to date from the date of the filing of the map and plan of irrigation, but such reservation shall be of no force whatever if such map and plan of irrigation shall not be approved. It is further provided that any state contracting under the act is authorized to make all necessary contracts to cause the said lands to be reclaimed and to induce their settlement and cultivation in accordance with and subject to the provisions of the act. But it is specifically provided that

the state shall not be authorized to lease any of said lands or to use or dispose of the same in any way whatever, except to secure their reclamation, cultivation, and settlement. It is further provided that, as fast as any state may furnish satisfactory proof according to such rules and regulations as may be prescribed by the Secretary of the Interior that any of said lands are irrigated, reclaimed, and occupied by actual settlers, patent shall be issued to the state or its assigns for the said lands so reclaimed and settled.

The Carey Act was amended by the Act of June 11, 1896 (29 Stat. 434). The amendment authorized the state to create a lien upon the lands granted for the actual cost and necessary expenses of reclamation. The amendment provides that a lien or liens is authorized to be created by the state to which such lands are granted and by no other authority whatever, and when created shall be valid on and against the separate legal subdivisions of land reclaimed for the actual and necessary expenses of reclamation and reasonable interest thereon from the date of reclamation until disposed of to actual settlers, and when an ample supply of water is actually furnished in a substantial ditch or canal or by artesian wells or reservoirs to reclaim a particular tract or tracts of such lands, then patent shall issue for the same to such state without regard to settlement or cultivation, but it is provided that in no event, and in no contingency and under no circumstances, shall the United States be in any manner directly or indirectly liable for any amount of any such lien or liability in whole or in part.

The Legislature of the State of Idaho by an act dated March 9, 1895, provided in section 1 (Session Laws of 1895, p. 219; section 1613, Rev. Codes; section 2996, Compiled Stats.) for the acceptance of the conditions of the Carey Act, together with all the grants of land to the state under the provisions of the act, and for the selection, management, and disposal of such lands, by a state board of land commissioners provided for by the act. By section 20 of the act (section 1629, Rev. Codes; section 3018, Comp. Stats.), it was provided that the water rights to all lands acquired under the provisions of the act should attach and become appurtenant to the land as soon as title passed from the United States to the state.

The facts in the case are stated by the District Court in Caldwell v. Twin Falls Salmon River Land & Water Co., 225 Fed. 588, and by this court on the former appeal in Twin Falls Salmon River Land & Water Co. v. Caldwell, 242 Fed. 177, 155 C. C. A. 17. It will not be necessary to restate more than a brief summary of such facts.

The agreements between the parties are attached to the amended complaint.

The contract between the state of Idaho, through its state board of land commissioners, with the Twin Falls Salmon River Land & Water Company, the appellant herein, and hereafter referred to as the "Construction Company," entered into on April 30, 1908, contemplated the construction of an irrigation system for the irrigation of approximately 150,000 acres of desert land. This estimate was based upon a report of the state engineer, which stated, among other things, that—

"The water supply will be taken from the Salmon river, the proposers holding a permit from this office to divert 1,500 cubic feet per second of time from that stream, together with all storm and flood waters. The Salmon river above the point of intended diversion has a drainage area of about 1,750 square miles, a good portion of which lies in the mountains where very heavy falls of snow occur each year. The waters available for the enterprise are unquestionably adequate for the purpose in hand, and the right of the proposers is most excellent, legally considered; all adverse priorities being so small in the aggregate as to be negligible."

In a public notice issued by the Construction Company it was announced that 80,000 acres of Carey Act lands were opened for entry under the canal system on June 1, 1908; that 70,000 acres of this land were filed on during the month of June. The notice announced: .

That "this tract of land affords better inducement to the home seeker than any other tract of land in the Northwest." That "the water supply for the Twin Falls Salmon River project is obtained from the Salmon river, which has a vast drainage area on the Cassia national forest reserve. The water right is perfect, and there is no land susceptible of irrigation above the Salmon tract and no water rights in contest. It carries water sufficient for the irrigation of more than 150,000 acres, in normal years, and as a rule the spring run-off is far greater than the amount of water required for the irrigation of this amount of land for the full season."

The contract between the state and the Construction Company provided for the organization of a corporation to be formed at the expense of the Construction Company, to be known as the "Salmon River Land Company"; the latter was to be organized with an authorized capital stock of 150,000 shares, which amount was intended to represent one share for each acre of the land which might thereafter be irrigated from said canal. This corporation will hereafter be referred to as the "Operating Company."

The contract further provided that the state of Idaho, by its state board of land commissioners, would not approve any application for filing on the land described in the contract until the person or persons so applying to the board should furnish to the board a true copy of the contract entered into with the Construction Company for the purchase of sufficient shares of water rights of said irrigation works for the irrigation of said land; that said shares of water rights were to be evidenced by the stock of the Salmon River Canal Company.

The contract called for the building by the Construction Company of an irrigation system to consist of a dam, reservoir formed by the dam, tunnels, and a canal with laterals. The contract which the settler was to enter into with the Operating Company provided that the interest of the settler in that company should be evidenced by a certificate showing the number of shares of the capital stock owned by the settler corresponding to the number of acres of land to be irrigated under the system. It was recited in the certificate that it entitled the owner thereof to receive one-hundredth of a cubic foot of water per acre per second of time for the land described in the certificate.

There is evidence in the record tending to show that on January 1, 1915, there were outstanding contracts between the Construction Com-

pany and the settlers for the delivery of water to tracts of land as follows:

Lands claimed under the Carey Act.............................65,727 acres
"       "       "       Desert Land Act........................ 4,939  "
"       "       " .  scrip locations .......................... 1,903  "
"       "       "    school land locations .................... 779  "

Total outstanding contracts........................73,348  "

Minor discrepancies will appear in the following statements relating to the acres of land under separate classifications and totals, but these discrepancies are unimportant and need not be further mentioned.

It appears, further, that the whole number of acres proved up by the settlers under the Carey Act was 44,022 acres; not proved up by settlers, 21,111 acres; total, 65,133 acres; that with respect to the Carey Act lands not proven up, no cultivation had been made on 16,000 acres; occupied and proved up, 5,700 acres; total, 21,700 acres.

Deducting entries on Carey Act Lands amounting to 16,000 acres, on which there was no cultivation made, from the total of 73,348 acres for which there were outstanding contracts running to claimants holding under the Carey Act, the Desert Land Act, scrip locations, and school land locations, leaves 57,348 acres of land which had been occupied and cultivated and for which water was claimed by the settlers for irrigation under the terms of their contracts with the Construction Company.

There is evidence in the record tending to show that this acreage is greatly in excess of the acreage for which water is available under the system, even during years of normal run-off, and for that reason the settlers contended that the Construction Company had failed to comply with the terms of its agreement and accordingly they refused to pay the installments due on account of the purchase price.

The complainants asked for a decree that the amount due from each and every settler and contract holder of water rights in said irrigation system should constitute and be declared to be a trust fund for the purpose of carrying out the objects and purposes of the contracts set out in the complaint and particularly to furnish each and every acre of land having water rights appurtenant to it with an ample and sufficient supply of water as contemplated by the contracts, and not less than one-half miner's inch per acre continuous flow, or 2¾ acre feet per acre, if delivered by periods upon demand of the several owners thereof, measured and delivered not more than one-half mile from the quarter section of land on the said irrigation system, and that the trust so declared and created be prior and superior to the rights or claims of any and all persons whatsoever; and that a receiver be appointed by the court to take immediate possession of the irrigation system and receive and collect all sums due from all water contract holders in the system and to hold and use the same as directed by the court; that the receiver be directed to secure an additional supply of water if the same be feasible, or in lieu thereof, to reduce the area of the project to a point within the water supply so that the land remaining should have appurtenant thereto an ample supply of water for irrigation; that the water

rights and contracts outside of said area and the corporate stock therefor should be canceled and that the owner of such canceled entries and stock be entitled to receive from the trust fund payment of all moneys paid therefor including interest and damages, to be determined by the court.

[1] When the District Court heard this case originally, the construction of these contracts between the state and the Construction Company and the Construction Company and the settlers together with other evidence was submitted to the court to determine the quantity of water per acre that was to to be delivered to the settlers during the irrigation season. The court determined that these contracts contemplated a right sufficient to enable the settlers to receive water at the rate of one-hundredth of a second foot per acre continuously during the season of actual irrigation, the amount of which was determined to be 2¾ acre feet, measured at the points of delivery from the system into the consumers' laterals. The court thereupon entered a decree that the Construction Company should not sell rights in excess of such available supply. The decree also restrained the Construction Company from making any additional contracts for the sale of water rights and also from waiving the right to forfeit any existing contract; and also restrained the Construction Company, together with the other defendants, from collecting or attempting to enforce payments upon such water right agreements, including any overdue payments of installments on said agreements, until such time as the holders thereof had been provided with the water supply so contracted for, or given trustworthy assurance to be approved by the court that such water would be provided. The court refused to appoint a receiver for the system.

On appeal to this court, Judge Ross, speaking for the court, stated the substance of the controversy as then presented in the following language:

"The difficulties that have arisen grow out of the fact, discovered, unfortunately, too late, that instead of the appropriation of the waters of the stream amounting in fact to 1,500 cubic feet per second, the supply, as shown by the record and according to the practical concession of the parties, was only about one-third of that amount—wholly insufficient for the reclamation and irrigation of the entire tract segregated by the Secretary of the Interior, and also insufficient, it is claimed, for at least the proper irrigation of all of the lands covered by contracts of sale issued by the construction company to settlers."

The court held that the settlers were entitled under their contracts to one-hundredth of a second foot of water per acre provided such quantity could be beneficially applied, but were not entitled as a contractual right to 2¾ acre feet per acre as held by the District Court, since that amount was merely determined in an advance estimate made by the proposer of the plan as to the capacity of the system. In other words, it was not an agreement on the part of the Construction Company that that amount of water would be delivered unconditionally to each settler during the season, but the court did hold that the Carey Act as amended required that an ample supply of water for the land should be actually furnished as a condition precedent to the issuance of the patent and that whether or not such a supply was actually fur-

nished was a question of fact, and that all questions of fact in relation to all the public lands were matters for the exclusive determination of the officers of the land department.

This aspect of the case presented a situation to the court which was obviously one of great difficulty in the solution of the questions involved in the issues of the case. It led the court to say in its opinion:

"When the well-known fact is remembered that desert lands after cultivation can produce profitable crops with less water than when new and that a very considerable quantity of the lands embraced within the present project have according to the records been abandoned with the possibility that more may be, it is at least to be hoped that of the remainder a success may be made for all concerned."

The court sustained the interlocutory decree restraining the Construction Company from making any further sales of water rights, but reversed it with respect to the requirement of 2¾ acre feet per acre. The court made no order with respect to the appointment of a receiver to take charge of the property and affairs of the Construction Company. Upon the return of the mandate of this court to the District Court, the decree of that court was modified accordingly. Thereafter appellants filed a supplemental answer.

It appears from this supplemental answer that subsequent to the first trial of the case, viz., on November 11, 1916, the state board of land commissioners had canceled a large number of entries made by the settlers under the Carey Act; that the area of these canceled entries amounted to approximately 13,000 acres, and that by such cancellation the number of acres for which there were outstanding contracts had been reduced to 60,170.8 acres. It appears further that on October 18, 1917, the state board of land commissioners entered a further order reducing the acreage of the project as follows:

"The total irrigable acres in the Salmon River Twin Falls Carey Project shall not exceed 35,000 irrigable acres within the project, and that the state land board will not apply to the federal government for patents to lands within the project which, added to any lands already patented, or state lands heretofore sold, or desert entries which may remain within the project, will make a total acreage receiving water from the irrigation system and within the project of over 35,000 acres."

It appears that this order contemplated the reducing of the project to 35,000 net irrigable acres or a gross acreage of approximately 39,-000 acres including nonirrigable land embraced within entries approved for patent, and that said order contemplated that approximately 21,000 acres out of the 60,170.8 thus embraced within outstanding water contracts should be excluded from said project and relinquished to the United States and should not be patented to the state of Idaho for irrigation under said irrigation system.

It appears from a stipulation just filed by counsel for the parties to this appeal that a patent has now been issued and delivered by the United States government to the state of Idaho based upon the application of the state for lands under the Carey Act; that the Department of the Interior, by the issuance of said patent, intended that the water available for such project should be used for the reclamation of a net irrigable area of approximately 35,000 acres, and said Interior

Department has declined to issue patent for the remainder of said Carey lands in said project.

By an order of the state board of land commissioners dated February 4, 1918, it was recited with respect to the project under consideration that its reduction to the number of acres theretofore indicated by the board would result in the exclusion of certain individuals, together with their titles, from the project, which would result in a depreciation of the value of the improvements placed upon their respective entries to the point of confiscation of such improvements.

It was therefore resolved in substance that a committee of one be appointed to assess and determine the value of the improvements placed upon all such excluded entries and report the same to the board, giving the legal subdivisions of the lands and the names of the entrymen, with items and character or value of improvements upon such entries; and that the land board transmit such report to the next Legislature for their consideration.

It appears from this report that two of the appellants, viz., James W. Beauchamp and Harold M. Sims, belong to the class of settlers whose lands will be excluded from the project, and that six of the appellants, viz., A. E. Caldwell, W. F. Mikesell, V. E. Morgan, J. E. Pohlman, W. C. Pond, and Carl Washburn, belong to the class of settlers whose claims will be included in the project and in the applications for patents and will therefore be entitled to receive water from the system.

This situation was pleaded in the supplemental answer of the Construction Company and is supported by the evidence. It is therefore contended by the appellants that there is a conflict of interest between the appellants whose lands will be excluded from, and those whose lands will be included in, the application for patents, and that the appellants whose lands are to permanently remain in the project cannot represent the settlers whose lands will be excluded therefrom. It is contended that their interests are wholly antagonistic.

Upon a rehearing before the District Court additional testimony was taken as to the amount of water required to irrigate the lands embraced in the project, and the court reduced its previous estimate from 2¾ acre feet to 2⅓ acre feet as the amount reasonably required for irrigation after the lands had been farmed a few years and the soil brought to a permanent irrigable status.

The court further found that the system would not, in an average year, furnish water at the farmers' headgates in excess of 57,000 acre feet, the court finding specifically that 56,500 acre feet was a fair estimate. The court, referring to the evidence upon which this estimate was based, says:

"What amount of land will the water available in an average year irrigate? The estimate of the Commissioner of the General Land Office and land board was 35,000 acres, but this was upon the condition that certain wasteful features of the system would be eliminated, and that this area would consist of a compact body of land. The Commissioner's conclusion (as shown by his letter of October 18, 1917) .that in the average year the system will deliver to the farmers' headgates 78,000 acre feet of water, must have involved the assumption of a realization of these conditions, for that amount is greatly in excess of what is conclusively shown by an actual test for the last seven years.

According to the records of the defendants, in only one year out of seven has the delivery equaled that amount, the average being between 56,000 and 57,000 acre feet; and the reservoir is now empty. In 1913 the delivery was 50,175 acre feet; in 1914, 73,933; in 1915, 27,030; in 1916, 57,232; in 1917, 97,953; in 1918, 54,517; and in 1919 (estimated) 33,000."

This estimate of 56,500 acre feet upon a basis of 2⅓ acre feet per acre for the season reduces the area of the irrigable project to 24,214 acres, instead of 35,000 acres as found by the state board of land commissioners upon the advice of the Commissioners of the General Land Office, and upon which finding a patent has now been issued to the state. Whether the water available for the irrigation of the lands in this project is ample for that purpose as required by the Carey Act is, as was stated in the former opinion of this court in this case and in the more recent case of Twin Falls Salmon River Land & Water Co. v. Davis (C. C. A.) 267 Fed. 382, a question of fact for the exclusive determination of the officers of the Land Department.

The court entered a decree that under the contracts and agreements between the settlers and the Construction Company, in addition to a proportionate incidental interest in the irrigation system and the franchises connected therewith, the settlers were entitled, among other things:

(1) To receive one-hundredth of a cubic foot of water per acre per second of time (measured from the main laterals into their private ditches) during the irrigation season, subject to the implied limitations that the right does not at any time exceed the amount of water reasonably required for the proper irrigation of the settlers' lands according to the usages of good husbandry; that under said contracts and agreements and pursuant to the mutual understanding of all the parties concerned and by virtue of the law, the Construction Company was not at liberty to sell or contract to sell such water rights in excess of the capacity of the reservoir and conduits which it had agreed to construct, or of the water supply made available by it for delivery therefrom in ordinary or average years.

(2) That the rate of 2⅓ acre feet per acre per season is and will continue to be required for the reasonable successful production (measured by the standards of good husbandry) of crops to which said lands are adapted and which have been and probably will continue to be grown thereon, and which the parties had in contemplation when said agreements were made, which said amount of water is less than one-hundredth of a second foot per acre flowing continuously during the irrigation season.

(3) That said Construction Company had outstanding contracts similar to those held by the settlers covering rights aggregating 60,-070.8 acres, all of which in so far as the record disclosed were apparently valid and were recognized by the defendant as conferring upon the holders thereof the right to receive water ratably and in proportionate amounts.

(4) That the reservoir and canals constructed by the Construction Company are of sufficient capacity to conserve and deliver the amount of water called for by said outstanding contracts, but that the water resources which the defendant had provided therefor furnish and

will furnish 56,500 acre feet per season and no more, measured at the users' headgates along the main laterals as in the contracts provided; that no other water supply is available, and consequently the system can be relied upon to furnish 40 per cent., and no more, of the water which the defendant, by its outstanding contracts, had agreed to sell and deliver, viz., 140, 396 acre feet per season.

This decree is based upon the contractual obligations of the Construction Company with the settlers, and takes no account of the probable and now the final determination of the Land Department that the project shall include the 35,000 acres of irrigable land.

During the progress of the trial in the District Court the plaintiffs produced evidence relating to certain charges contained in the statement of the Operating Company submitted to the state board of land commissioners. The charges relate to certain alterations in the canal system in what is designated in the testimony as a "check basin." This basin is situated a short distance below the dam and was constructed to be used as a reservoir and as part of the canal system, but when it was brought into use it was found that there were openings in the bottom of the basin through which the water escaped into the underlying broken lava formation. One opening in particular was so large it was found necessary to throw a dyke around it so that the water could not reach it. It was also found that the outlet was not properly constructed. The Commissioner of the General Land Office in his letter of October 18, 1917, called the attention of the state board of land commissioners to this waste of water, and suggested that a marked saving could be made by eliminating the check basin, and that this could be done by building a canal through or around the basin. This was accordingly done, and the actual maintenance charge per acre for the year 1919 was increased by 50 cents per acre on 46,067.5 acres to cover this additional expense. The state board, to which the Operating Company must submit its accounts under the state law, tentatively permitted the Operating Company to make the collection upon the condition that the settlers have a credit for the amount thereof in the purchase price, if upon final consideration it should be held to be a construction rather than a maintenance charge. This question was not placed in issue by any pleading, but came into the case as evidence upon the general issues. The court held in a separate decree that the charge was one of construction rather than maintenance. The state board of land commissioners appear to still have this charge under advisement, but neither the board nor any of its members is a party to this action. They were originally made defendants, but have since been dismissed from the case by the plaintiffs.

We are of the opinion that this controversy cannot be solved between the parties to this action. It is unfortunate, but there seems to be no escape from this conclusion. All the plaintiffs do not constitute a class having a common or general interest in the questions to be determined and cannot represent other parties not similarly situated. Two of the plaintiffs are to be excluded from the project and their entries are to be canceled and their lands restored to the public domain. There will be a number of settlers similarly situated. Eight

of the plaintiffs belong to a class of settlers whose interests are to be included in the project and who are to receive patents for their lands. There will be a number of settlers similarly situated, but these two classes are in conflict. The settlers in one class are not similarly situated with settlers in the other class, and one cannot represent the other. Their interests are not common but in opposition.

We are of the further opinion that this controversy cannot be solved upon the issues contained in the pleadings. A determination of the contractual rights between the parties is not sufficient. It does not determine the important and controlling fundamental questions of statutory law, involved in the case. A stipulation just filed by the parties to this appeal sets forth that a patent has now been issued and delivered by the United States to the state of Idaho for approximately 35,000 acres of land in this project. This action on the part of the federal government establishes the fact that the Secretary of the Interior has determined in effect that an ample supply of water has been provided for the irrigation of 35,000 acres of irrigable land within the project. We must accept that finding as conclusive. The identification of such lands by sectional division cannot be made now by the court in this case. It has probably been made by the Secretary of the Interior in the patent just issued. It may be that upon this patent the rights of the parties may be sufficiently classified and fixed that the court properly invoked may be able to enter the controversy and determine the questions at issue between the parties so classified.

"If other parties possess equities superior to those of the patentee, upon which the patent is issued, a court of equity will, upon proper proceedings, enforce such equities by compelling a transfer of the legal title, or enjoining its enforcement, or canceling the patent." Gibson v. Chouteau, 13 Wall. 92–102, 20 L. Ed. 534.

We are also of the opinion that the charge relating to the construction of the canal around or through the check basin is not within the pleadings of the case and that all the parties interested in that charge are not before the court.

The 46,067.5 acres upon which the charge for maintaining the system for the year 1919 has been increased 50 cents per acre to meet this additional expense introduces another area into the controversy calling for another classification of the settlers as parties to the action. The area of the system having been reduced to a net of 35,000 acres by the Land Department, there will be settlers claiming several thousand acres whose claims are excluded from the system and who as settlers have no further interest in the question whether the charge should be treated as construction or maintenance. It must be plain from this statement alone that we are dealing with a controversy that can only be determined judicially when it is definitely known for what particular lands the patent has been issued to the state.

At present we do not see how the questions at issue can be determined upon the law and between the present parties to this action, without further proceedings. We accordingly direct that an order be entered that the decree of the District Court be reversed save and except as to the injunctional provisions thereof, and that the cause be remand-

ed to that court with instructions to direct that new pleadings be framed according to the suggestions of the foregoing opinion, and that all parties necessary to a final determination of the subject-matter of the suit as it affects the rights of the parties hereto and all other parties interested therein be brought into the suit and aligned therein according to their respective interests, and for such further proceedings as may be necessary and appropriate for the final disposition of the matters in litigation.

It is so ordered.

### On Petition for Rehearing.

In the opinion of this court in this case filed March 9, 1921, we held with respect to the "check basin" controversy that the question involved was not placed in issue by any pleading, but came into the case as evidence upon the general issue. Such was in fact the record, but, in a petition for a rehearing upon this question, counsel for appellants, under a general stipulation between counsel for supplying additional records, have filed a copy of a petition in the lower court, filed in that court on March 25, 1919, praying for an injunction restraining the appellees from further prosecuting an action in the state court against the appellants for a writ of mandate and from prosecuting any suit or action against the appellants in the state court involving the determination or adjudication of the question or questions involved in this suit in the United States District Court.

It appears from this petition that the cost of the construction of the "check basin" was involved in that proceeding. The petition alleges:

"The question as to whether or not the work now being done on what is known as the 'check basin' is original construction work, which should be done at the cost and expense of the Twin Falls Salmon River Land & Water Company, or maintenance work, to be done and performed at the expense of said Salmon River Canal Company, Limited, and as to whether said irrigation system has been completed substantially according to the terms of the said state contract, or whether the said Twin Falls Salmon River Land & Water Company is required to make other additional improvements thereon, * * * all of which matters are in issue in this cause now pending in this court as aforesaid."

Upon this petition the District Court awarded an injunction against the appellees' proceeding in the state court for the determination of the "check basin" controversy, and later entered a decree finding and adjudging that the expense of constructing the "check basin" was chargeable to construction rather than to maintenance. It therefore appears that the controversy concerning the "check basin" was definitely brought into this case by the injunction proceedings, and, as that injunction was involved in the appeal, it is now properly before the court. In our opinion we also held that the state board of land commissioners appeared to still have the charge for the construction of the "check basin" under advisement, but neither the board nor any of its members were parties to this action. They were originally made defendants, but have since been dismissed from the case by the appellants. It is a question whether the state board, in connection with the state engineer, has anything more than supervisory power as to construction work under the statute.

We also held that the 46,067.5 acres, upon which the charge for maintaining the system for the year 1919 had been increased 50 cents per acre to meet the additional expenses for alteration of the canal system through the "check basin," introduced another area in the controversy calling for another classification of settlers as parties to the action. But the dominating fact is that this 50 cents per acre is an assessment that has been paid by the parties possessing certain locations within the general area. The allegation in the petition for an injunction, taken in conjunction with the pleadings and evidence in the case, and the decree entered therein, appear to bring the question of the assessment before us for the area upon which the assessment appears to have been levied.

[2] The appellants contend that the decree of the lower court is in error in finding and adjudging that the cost of the check basin is a construction charge. The opinion of the District Court upon this question is as follows:

"The question is: Against whom shall be charged about $20,000 expended during the current year in altering what is known as the check basin—the construction company or the settlers. This unit, so called, is a natural basin of about 90 acres in area, situate a short distance below the dam, and was utilized by the promoting company as a part of its canal. Naturally the seepage and evaporation from such a unit would be greater than from an ordinary canal channel; but of more importance is the fact that as soon as it began to be used holes developed in the bottom of the basin, through which the water poured into the underlying broken lava formation. A still further loss was suffered from the fact that the basin is lower than the bottom of its outlet, and hence, when the water is shut off at intervals, as is the practice during the irrigating season, that part which cannot be discharged is lost through percolation and evaporation, and when the water is again turned in it is necessary first to fill up this reservoir with a new supply, which in turn is wasted when the source is shut off. In practice there has been inspection of the bottom of the basin from time to time when the water is off, for the purpose of discovering newly developed holes, and such as have been found have been successfully filled up, with the exception that in the earlier years one opening developed of such magnitude that it was found necessary to encircle it with a dike, and thus prevent the water from reaching it. It is also to be added that by reason of the fact that the throat of the outlet was not properly constructed—it was too narrow and too high—it became necessary to hold the water in the basin at a level considerably above that which would otherwise have been necessary, thus adding to the peril and loss arising from the defective basin.

"In his letter of October 18, 1917, to the state land board, the Commissioner of the General Land Office directed attention to the waste in this part of the system, and suggested that if the canal were built through or around the basin there would be a marked saving in water, and intimated that as a condition to the patenting of 35,000 acres it would be necessary for the construction company or the committee of bondholders to eliminate this feature. Accordingly the following season the defendant Salmon River Canal Company, which is under the control of the promoting company and the bondholders, commenced the construction of a canal through the basin, paying the expense out of the funds collected from the settlers for maintenance purposes. In the winter and spring of 1919 the work was resumed, and the annual maintenance charge per acre for the year 1919 was increased by 50 cents an acre to cover the expense, which was estimated to be between $20,000 and $25,000. The state board, to which the canal company must submit its budget, tentatively permitted it to make the collection, upon the condition that the settlers have credit for the amount thereof on the purchase price, if upon final consid-

eration it should be held to be a construction, rather than a maintenance, charge. During the hearing here upon the merits both parties applied for restraining orders, the plaintiffs to prevent the collection of the charge, and the defendants to prevent the plaintiffs from pressing an application pending in the state court to require defendants to furnish water to those who refused to pay, and upon consideration an order was made in effect substantially the same as that of the state board, and the question is now submitted whether or not the expense in question can properly be recovered from the settlers as a maintenance charge.

"While there is testimony to the effect that the basin has a measure of utility in operating the system, I cannot escape the conclusion that economy of construction rather than considerations of utility furnished the controlling reason for the use of the basin, instead of constructing a canal through or around it. That the system can be operated without it is conclusively shown, and so much is admitted by the defendants in their act of eliminating it. Furthermore, I have no doubt that the underlying motive for its present abandonment and the construction of a canal through it is the desire to comply with the suggestion of the Commissioner of the General Land Office, and thus procure for the defendants, the Land and Water Company and the mortgage trustees, the very substantial benefit arising from the increased acreage against which they will be able to collect construction costs. True, their motive is not necessarily the decisive issue, but it has an important bearing upon such issue. It must be borne in mind that they and not the settlers are, and always have been, in control of the canal company, by which ostensibly the work is being done. No emergency had arisen, and there had been no substantial change of conditions for several years. It may be admitted that it would have been better construction not to have utilized the basin— that was obvious from the beginning. But, when the work in controversy was undertaken, the peril had not increased; upon the other hand, it did not appear to be so imminent, for during several years and until there was an opportunity for profit, the defendants were content to operate through the basin, and each year's successful operation gave additional ground for the belief that there would be no serious casualty. By their proposed action they would now put the entire burden of making the alteration upon the settlers and take for themselves the benefit. In defense of their position that it is not a construction charge, the defendants rely upon the fact that the basin is delineated upon a general map of the system, made after the original contract with the state, and the further fact that in certain of the reports of the state engineer and his assistant it is referred to as a part of the system. But these facts are inconclusive. It is not pretended that the state board ever accepted, or, with knowledge of the conditions, approved of, the basin as a part of the system. The maps also show rights of way for canals and ditches, but it would hardly be contended that if, in constructing a canal along such right of way, an open chasm were encountered, the state board would be bound to accept the canal, though it would carry no water, but simply pour it into such chasm.

"It has been repeatedly contended by the parties and held by the courts that in such undertakings all parties contract with reference to the law, and into their agreements must be read pertinent provisions of the statutes. Here doubtless all parties interested understood that the system contracted for was to measure up to the standard imposed by the statutes. The state was not contracting with the promoting company for part of an adequate system, but for a completed adequate system. No other construction work was contemplated. When the Land and Water Company got through there was to be nothing more to do—there was to be a system up to the requirements of the law. But under the federal statutes the water must be furnished in a 'substantial ditch or channel.' If, in 1918 and 1919, this basin was a substantial water conduit, then the defendants were wholly unwarranted in seeking, for their profit, to change it at the expense of the settlers. If it was not a substantial water conduit, then it never was built to comply with the law, for admittedly it had been improved, and was in a safer and more efficient condition in 1918 and 1919 than in 1911, when it was first put into

use. The construction contract authorizes the use of 'natural channels or coulees,' but only when 'suitable.' It is to be borne in mind that we are not here concerned with the question merely whether it would be good engineering and good sense to permit water to spread over an area of 90 acres, and thus be subject to excessive evaporation and percolation. If that were the only question, possibly the state and settlers would be bound; but the defendants cannot take that position, for, if that were all, as already suggested, there would be no occasion for their precipitous action at this time, and there would be no possible excuse for imposing such an expense upon the settlers against their will. They must necessarily take the position that the system is in peril, and that, if it is to function normally, this work must be done. The check basin being in as safe and efficient a condition now as it was when it was first used, it necessarily follows from the defendants' own contentions that the basin never was either a 'substantial' conduit, as required by law, or a 'suitable' natural channel, as expressly required by the contract, and accordingly it must be held that its incorporation into, did not operate to complete, the system, and that the expense of the present work is chargeable to construction rather than to maintenance."

We concur in this opinion, and therefore affirm the decree with respect to the check basin. Our former opinion will be amended in this particular.