## COMMONWEALTH TRUST COMPANY OF PITTS-BURGH *v.* SMITH ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 7.    Argued February 29, 1924.—Decided November 17, 1924.

1. On appeal from a decree dismissing a bill because of refusal to bring in additional parties, the merits are not open but only the question whether such parties were necessary. P. 159.
2. Parties are necessary who have such an interest in the matter in controversy that it can not be determined without affecting that interest or leaving the interests of those who are before the court in a situation that might be embarrassing or inconsistent with equity. *Id.*

3. After a State had agreed with the Secretary of the Interior for the reclamation of certain public lands under the Carey Act, a company contracted with it to construct works and supply water to irrigate those and other lands, and to sell to each settler a perpetual right to a stated quantity of water for each acre of his tract, with a proportionate interest in the works and water appropriation, at a stated price per acre, no water-rights to be sold in excess of the capacity of the works or available water supply, all to be of equal priority, and the company to have a lien on each water-right to secure payment of the price. Afterwards the company made contracts, all alike in tenor, with many individual settlers, each reciting that it was made in virtue of, and to be governed by, the contract between the company and the State, each granting the settler water-rights and proportionate interests in the works, etc., in terms accordant with those provided by that contract, with a right to pay the price in instalments during a period of years, and entitling the company to a lien on the settler's water-right and land to secure payment. Thereafter, a controversy arising as to the sufficiency of the available water supply to reclaim the acreage for which water-right contracts were outstanding, and the settlers for this reason defaulting in payments, the trustee for the company's bondholders sued to foreclose the lien on the land and water-rights of two of them only, setting up the controversy and claiming, in disregard of the express stipulations, that the total amount of lien intended by the Carey Act must be determined by distributing the total actual outlay for the irrigation works, with reasonable interest, over all of the reclaimed lands, on an acreage basis. *Held,* that the suit could not be maintained in the absence of the other contract-holders (settlers) as parties. P. 159.

4. Under the Carey Act, where the water supply is adequate for part only of the acreage for which water-right contracts are outstanding, some of the contracts must be eliminated before any of the lands can be deemed reclaimed or be adjudged subject to a lien for the cost of water-rights. P. 160.

273 Fed. 1, affirmed.

APPEAL from a decree of the Circuit Court of Appeals affirming a decree of the District Court which dismissed a bill for want of necessary parties.

19458°—25——14

*Mr. Oliver O. Haga,* with whom *Mr. James H. Richards, Mr. McKeen F. Morrow* and *Mr. J. L. Eberle* were on the brief, for appellant.

*Mr. Turner K. Hackman,* for appellees, submitted.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This suit is an incident of the partial failure of an irrigation project in the State of Idaho, called the Salmon River Project, which was undertaken in accordance with the Carey Act, c. 301, § 4, 28 Stat. 422; c. 420, 29 Stat. 434; and c. 853, § 3, 31 Stat. 1188, and the legislation of the State accepting the conditions of that act and providing for their performance, § 2996, *et seq.,* Idaho Comp. Stat. 1919. A statement of the situation leading to the suit will be helpful in understanding its nature and purpose.

The project comprehended (a) the donation by the United States to the State of 127,000 acres of arid public lands, (b) the reclamation of the lands through an agency of the State by means of extensive irrigation works drawing a supply of water from the Salmon River, and the disposal of the lands, with suitable water rights, to settlers in tracts of not more than 160 acres to any one person. Other lands, lying among the 127,000 acres, were included in the project, making a total of 150,000 acres.

In 1907 George F. Sprague and others, who had devised the project, submitted to the State Land Board a proposal to construct the necessary irrigation works and to provide the requisite supply of water. In the proposal they represented that, if it was accepted, they would organize a corporation with capital sufficient to complete the works and to put the same in operation so as to reach and reclaim all of the 150,000 acres; that the water supply intended to be utilized was ample for the purpose, and

that water rights would be sold to settlers at forty dollars per acre. The representation respecting the water supply was set forth with much detail in an accompanying statement by their consulting engineer.

The board, after referring the proposal to the State Engineer and receiving from him a favorable report, provisionally accepted the proposal and forwarded it to the Secretary of the Interior with a request that the 127,000 acres of public lands be segregated from other public lands and that a contract be made between the United States and the State binding the United States to donate, grant and patent the lands to the State, if and when the latter caused them to be reclaimed.

The segregation was made, and on April 10, 1908, the United States and the State entered into such a contract. It provided, among other things, that the United States should patent to the State, or to its assigns, any particular tract or tracts whenever an ample supply of water to reclaim the same was actually furnished in a substantial ditch or canal; that all persons acquiring rights to such lands from the State prior to the issue of patent by the United States should take and hold the same subject to the requirements of the Carey Act and the terms of the contract; that full compliance therewith should be a condition to obtaining a right to a patent from the United States; and that the work of reclamation should be completed within ten years.

The State and the Twin Falls Salmon River Land and Water Company, to which Sprague and his associates had transferred their interests in the project, then entered into a contract by which that company bound itself to construct and complete the irrigation works within five years, to provide the requisite supply of water, and to sell to each settler a perpetual water right of one-hundredth of a cubic foot of water per second of time for each acre in his tract,—the price of the water right to be not more

than forty dollars an acre, and the water right to include a proportionate interest in the irrigation works and in the water appropriation and franchises pertaining to them. Other provisions in the contract were to the effect that no water rights should be sold in excess of the capacity of the works or of the available water supply; that the company should have a lien on each water right to secure payment of the purchase price; and that there should be no preference or priority among the holders of water rights, but all should be on the same plane regardless of the order in which the rights were purchased. In still other provisions the State agreed to dispose of the lands to settlers at fifty cents an acre, and not to recognize any right in a settler unless and until he contracted with the company for a water right sufficient for the irrigation of the tract he was seeking. After completing the works and putting them in operation the company was to transfer their ownership and control to a corporate agency of the settlers, who were to hold its shares in the same proportions that they held the water rights. The moneys accruing from the sale of water rights were to belong to the construction company, and it was not to be otherwise compensated for its outlay and efforts.

The contracts by which the water rights were sold to settlers were all of the same tenor. Besides declaring that they were made in virtue of the contract between the State and the company and that the rights of the parties were to be governed thereby, these contracts showed that the settler was to have a right to receive during each irrigation season one-hundredth of a cubic foot of water per second of time for each acre in the tract which he was seeking to acquire from the State, and also a proportionate interest in the irrigation works, etc.,—such interest to conform to the proportional relation between the number of acres covered by his water right and the

total acreage covered by all water rights sold " in accordance with " the contract between the company and the State.  The price to the settler was a definite sum calculated at the rate of forty dollars per acre and payable in stated installments spread over a period of eleven years.  To secure payment the company was to have a lien on the water right and the land, and, if it so requested, was to be given a mortgage on the land when the settler received the legal title.  If default was made in the payment of any installment the company was to be at liberty to declare the entire amount then unpaid immediately due and payable and to proceed to collect the same and to enforce such lien as it might have on the water right and land.

The contracts between the United States and the State, between the State and the company and between the company and the several settlers all expressly recognized the laws under which they were made as parts of them.

After the irrigation works had been partly constructed and the lands opened to entry and many water-right contracts made, it was found that the available water supply was not only short of what was required to irrigate 150,000 acres but short of what was required to satisfy the water-right contracts already made, which aggregated 73,000 acres.  In 1915 some of the settlers obtained, in a suit against the company, an interlocutory decree declaring that the outstanding water-right contracts were in excess of the available water supply and prohibiting the sale of further rights, 225 Fed. 584; 242 Fed. 177; 272 Fed. 356.  In 1916 the State Land Board dealt with the shortage by cancelling the settlers' entries amounting to 13,000 acres and declining to allow further entries or to approve further sales of water rights, thereby in effect requiring that the water supply be applied to not exceeding 60,000 acres.  In 1918 the board, on further con-

sideration, concluded that the available supply was not sufficient to irrigate more than 35,000 acres and made an order that it be distributed over and made appurtenant to that number of irrigable acres and no more, and that the outstanding contracts for water rights in excess of that acreage be cancelled.

The shortage of water and the proceedings resulting therefrom led to many controversies between the construction company and the settlers and to a general failure on the part of the latter to pay the deferred installments of the purchase price for the water rights. The settlers insisted, and some of them satisfied a court to which they resorted, that the available water was not sufficient to irrigate more than 25,000 acres.

Such was the situation when this suit was brought. The plaintiff is a trustee in a deed of trust given by the construction company to secure payment of a large issue of its bonds, and under that deed holds as collateral the company's rights under the contracts with the settlers and all liens to which it may be entitled under them and the legislation on which they are based. The defendants are two settlers holding contracts for water rights on which the deferred installments of the purchase price have not been paid. The plaintiff has elected to declare the full amount remaining unpaid due at once and to enforce payment accordingly. By its bill it asserts a lien on the water rights and the lands for which they were purchased, seeks a foreclosure of the lien and asks a judgment for any deficiency. Other features of the bill will be noticed later on. In their answer the defendants admit some of the plaintiff's allegations, deny others and assert a right to counter relief.

On the defendants' motion the District Court ruled that the other holders of water-right contracts were necessary parties and ordered that the plaintiff bring them in. The plaintiff refused, and the bill was dismissed. The Circuit

Court of Appeals affirmed the decree, 273 Fed. 1, and the plaintiff appealed to this Court under § 241 of the Judicial Code.

In the briefs there is much discussion of questions which might arise if the case were here on the merits. But, as the bill was dismissed because of the refusal to bring in additional parties, the only question open here is whether the parties indicated were necessary parties. Of course they were, if they had such an interest in the matter in controversy that it could not be determined without either affecting that interest or leaving the interests of those who were before the court in a situation that might be embarrassing and inconsistent with equity. *Shields* v. *Barrow,* 17 How. 130, 139.

The plaintiff takes the position that the suit is simply one to foreclose a distinct lien on particular water rights and lands, in which the other holders of water-right contracts have no interest, and that a final decree determining the issues in the plaintiff's favor and granting the relief sought can neither affect the other holders of such contracts nor work any embarrassment or inequity to the defendants. In our opinion that position is not tenable. The suit is much more than one for a simple foreclosure. The bill sets forth the controversy respecting the water supply and does so for the purpose of having it determined. The controversy is not peculiar to the contracts sued on but reaches and affects all that are outstanding. The contracts, while several in form, are interdependent in substance and operation. All are effectively tied together by the contract between the State and the company, in virtue of which they were made, and by what they purport to do, which is to entitle their holders to participate on equal terms in the use of a common supply of water and to invest them with proportionate interests in the works by which the water is collected and conducted to the places of use. As was well said by the Dis-

trict Judge, " In a very substantial sense all the settlers are parties to one general contract, in the subject matter of which all are interested and by virtue of which all have rights so interdependent, whether they be regarded as joint or several, that the interest of one cannot be defined and adjudicated without affecting the interests of all others."

Other considerations leading to the same result will be briefly stated.

According to the Carey Act a tract is not reclaimed until " an ample supply of water is actually furnished " for its irrigation and cultivation; and only when it is reclaimed can it be charged with a lien for the cost of water rights.  If, therefore, the supply of water is not adequate for the reclamation of the acreage for which water-right contracts are outstanding, and yet is adequate for the reclamation of a smaller acreage, as is asserted on one side, it is evident that some of the contracts must be eliminated before any of the lands can be said to be reclaimed, or be adjudged subject to such a lien.  Of course, an ascertainment or designation of the contracts which must fall and those which are to stand cannot be had in a suit to which their holders are not parties.

The same thing is true as respects the elimination of contracts made in contravention of the provision in the contract between the State and the company that water rights should not be sold in excess of the available water supply.

The bill practically disregards the stipulations fixing the price of water rights at forty dollars an acre and proceeds on the theory that the amount of the lien intended by the Carey Act is to be determined by distributing the total actual outlay for irrigation works, etc., with reasonable interest thereon, over all of the reclaimed lands on an acreage basis.  Applying that theory, the bill alleges that if the supply of water is found to be ade-

quate for 60,000 acres and no more the amount due is to be computed at sixty dollars an acre, and if the supply is found to be adequate only for a smaller acreage a correspondingly higher rate is to be used in the computation. This theory involves a determination of the total outlay and of the total area reclaimed. In view of what is comprehended in these questions they should be determined once for all. Every contract holder has an interest in them and will be affected by their determination, however made. It is of concern to him, not merely whether his tract is held to have been reclaimed and to be chargeable with part of the general outlay, but also whether and to what extent other lands are in the same situation. In this and other respects what is determined in respect of other holders is of direct concern to him. In short, the interests of the contract holders are so related that an effective and just determination of the questions can only be had in a proceeding to which all are parties.

What we have said requires that the decree be

*Affirmed.*