FARIS, as Commissioner of Reclamation for State of Idaho, v. BLAINE COUNTY INV. CO. et al.

No. 742.

District Court, D. Idaho, E. D.

May 4, 1933.

Bert H. Miller, Atty. Gen., and Richards & Haga, of Boise, Idaho, for plaintiff.

J. H. Peterson, of Pocatello, Idaho, for Blaine County Inv. Co., Blaine County Canal Co., M. H. Woods, and certain other defendants.

J. H. Andersen and G. F. Hansbrough, both of Blackfoot, Idaho, and T. D. Jones, of Pocatello, Idaho, for defendants and cross-complainants Mary I. Carton et al.

Frank B. Stephens, Dean F. Brayton, and William J. Lowe, all of Salt Lake City, Utah, for Columbia Trust Co. and Frank B. Cook.

CAVANAH, District Judge.

The nature of the suit presents a controversy which has been in existence for some time and is without a parallel in the history of litigation over the right to the use of water and the supply available in the reclamation of lands. As usual, the contest is between several groups who assert different contentions

as to why their rights should be superior and others forfeited. After all is considered and said, the record in this class of cases resolves itself into the conduct of some one who has sold more water than is available to irrigate and produce crops upon the lands where the water is to be delivered. The court is told that this case stands alone, as there has never been in the state presented such a perplexing situation. Probably that is true, for it is difficult to understand why, after the recognition of rights, it was necessary for those who were interested in the organization of the project, loaning money to complete the construction of the works and the reclaiming of the lands, to pursue the course which has at times caused such a spirited contest between those interested in the project. But we find, after all, that there are applicable to the issues and facts here certain well-settled principles governing the appropriation and use of public waters when reclaiming lands, and when they are applied we have a guide in determining the obligations and rights of the parties.

The history and development of the project, as disclosed by the evidence, reveals that prior to 1910 there were settlers under the Homestead and Desert Laws on the project, now known as the "Little Lost River Project," who were endeavoring to secure water to irrigate their lands under an incomplete system initiated by C. M. Wickham, and who in the spring of 1908 interested the defendant M. H. Woods in the project, who thereafter, and prior to 1910, advanced about $10,000 to Wickham, to be used in the completion of the reservoir and works, and as security therefor he received $19,000 in bonds on the project. The $10,000 loan was never paid, nor were the bonds foreclosed. In 1909 neither Wickham nor the settlers had funds to complete the reservoir and ditches to carry water to the settlers' lands, so at that time Woods and John S. Parks bought Wickham's interest for the sum of $15,000. This retired Wickham from the project. More money was needed to carry on the project, and Woods advanced a further sum of $20,000. The Blaine County Irrigation Company was organized by Wickham, and stock was issued to the settlers by him prior to the time Woods came upon the project. Each share represented water for an acre of land. This was the first sale of water on the project. The Wickham project having failed to bring water to the settlers' lands, it was in the spring of 1910 decided by all interested to convert the project into a Carey Act one, and then the Blaine County Irrigation Company, which

was in charge of the project, entered into a contract with the state for the segregation of the lands under the Carey Act (43 USCA § 641 et seq.) of an area of 15,480 acres. The usual procedure was taken in placing the lands and water under the Carey Act. The settlers attended the Carey Act opening, and were allowed, after relinquishing the lands they held under the homestead and desert entries, under the contract with the state, to have a preference to refile under the Carey Act upon the lands they had theretofore filed upon under their homestead and desert entries. Woods was president of the irrigation company when the contract was entered into with the state. That company undertook to construct an adequate system for the irrigation of the lands under the project. It seems to have failed. On March 25, 1914, Parks appeared before the state land board as receiver of the irrigation company which had become insolvent, and the trust deed securing its bonds was foreclosed, and the bondholders who purchased at the foreclosure sale the rights of the irrigation company organized the Blaine County Investment Company, and thereupon the investment company issued its trust deed and bonds. Before the organization of the investment company and the execution of its trust deed and bonds, water rights for 13,600 acres of land had been sold. At the time the irrigation company entered into the contract with the state, the Blaine County Canal Company was organized as an operating company in which stock of about 12,240 shares were sold to the settlers on the project. Some time in 1916 the canal company became insolvent and was unable to complete the system, and its affairs were taken over by the investment company. Thereafter, and in 1916, the investment company executed and delivered to the defendants Columbia Trust Company and Frank D. Cook, trustees, a mortgage or deed of trust on the equity or interest of the investment company in the works and settlers' contracts securing the payment of $175,000. The state land board, realizing in 1918 that there was not sufficient water available to irrigate the lands for which water contracts had been entered into and stock sold, directed that no more water should be furnished or sold to lands in excess of an area of 7,890 acres.

The contracts for the 13,600 acres originally sold called for 2 acre feet per acre to be measured at the farmer's headgate, and we find that there is now only water available for the irrigation of the lands from the water belonging to the project, including the Knol-

lin water, for 5,000 acres on the basis of 2 acre feet for each acre. After considering the condition of the system and the losses, it is apparent that considerable repairs are required to be made in order to have delivered the water to the settlers' lands.

Efforts have been made to secure patent for more lands than there is water available for the successful reclamation of the lands, and the Department of the Interior has declined to issue patent for that reason.

The first problem for the court to solve is to determine what is the present available water supply for the project on the basis of 2 acre feet per acre. The evidence is clear that it does not exceed 5,000 acres. So this brings us then to the principal contention of the plaintiff and some of the defendants that the lands and water rights of the defendants investment and canal companies and Woods, and the bonds and mortgage held by the Columbia Trust Company and Cook, as trustees, are subordinate to the rights of the settlers, for the reason that there was sold water rights to the settlers in excess of the available water supply which was a wrong that should be righted by reducing the project in extinguishing rights of the wrongdoers.

█ The Carey Act requires an ample supply of water, and contemplates that only ample water rights shall be sold, and, as between such settlers, there is no priority of right, and each settler is entitled to his proportionate share of the water rights and in the system of the project. Under the statutes of the state, it is unlawful to sell water in excess of the capacity of the works or more water than is available (Code Idaho 1932, § 41-2201 et seq.). State and Ryals v. Twin Falls-Salmon River Land & Water Co., 30 Idaho, 41, 166 P. 220; Commonwealth Trust Company of Pittsburgh v. Smith et al., 266 U. S. 152, 45 S. Ct. 26, 69 L. Ed. 219; Gooding et al. v. Idaho Irrigation Company, 265 U. S. 518, 44 S. Ct. 618, 68 L. Ed. 1157; Idaho Irrigation Co. v. Gooding et al. (C. C. A.) 285 F. 453; Judge Dietrich's opinion unreported in the case of Gooding et al. v. Idaho Irrigation Co. As was said by the Supreme Court in Commonwealth Trust Co. of Pittsburgh v. Smith, supra, in deciding what is to be done where it appears that the water supply is not adequate for the reclamation of the acreage for which water rights contracts are outstanding, that, "According to the Carey Act, a tract is not reclaimed until 'an ample supply of water is actually furnished' for its irrigation and cultivation, and only when it is reclaimed can it be charged with a lien for the cost of water rights. If, therefore the supply of water is not adequate for the reclamation of the acreage for which water-right contracts are outstanding, and yet is adequate for the reclamation of a smaller acreage, as is asserted on one side, it is evident that some of the contracts must be eliminated before any of the lands can be said to be reclaimed, or be adjudged subject to such a lien."

█ There can be no dispute as to the correct principle being that, where one sells more water than he is able to supply, the court will require him to relinquish to the purchasers in order to fulfill his sale contracts the water that he may have acquired or retained for his own use until the amount called for by the sales contracts is complied with, and, as among the individual owners, the water right conveyed must be shared proportionately. Idaho Irrigation Company et al. v. Gooding et al., supra. The fact that the settlers' water contracts were deposited by the canal and investment companies with the defendant Columbia Trust Company as security for the bonds or debts of the investment company does not lessen the rights of the settlers under their contracts, as the trustees hold the contracts subject to rights existing in favor of the settlers. The trustees stand merely in the shoes of the investment company, and, under the trust deed and bonds, have a lien upon the interest of the investment company in the system, and on the uncollected balance under the water contracts, which were pledged with the trustees as security for the bonds, provided the terms of the settlers' contracts have been by the irrigation and investment companies complied with. The inquiry then is: Do the facts here bring this case under this principle? The water contracts involved were entered into in September, 1910, between the irrigation company and the settlers. They were hypothecated for another bond issue which was foreclosed, and the old bondholders organized the investment company and took stock on the basis of the amount of the bonds formerly owned. The present bond issue was issued and sold about July 1, 1916.

█ We now approach the contention as to what lands should be eliminated from the project, and before doing so it first becomes necessary to determine the acreage entitled to water available from the system on the basis of 2 acre feet per acre. In 1918 the state land board decided that the project should embrace 7,890 acres, and it thought there was available water supply from the system of sufficient amount to irrigate the

384

same, but we are now informed from the evidence that there is only water available to irrigate 5,000 acres after allowing the necessary amount of 2 acre feet for each acre. One would conclude from the evidence that the land board recognized the different classes involved, and granted to them some water, although it awarded 2,890 acres more than there was sufficient water to irrigate the lands. But the court can now only recognize and determine the total acreage on the project that has vested rights to the use of water, and then on this Carey Act project decree that they shall share proportionately in the 10,000 acre feet, which will result in eliminating from the project all lands and claims of water rights of the investment and canal companies and the Columbia Trust Company and Cook, trustees. The claims of the investment and canal companies and the trustees to the use of water from the project and by lien are subordinate to the rights of the settlers and Woods, except as to the uncollected balance for the water rights, for the reason that there was sold more water rights than available by those companies, and they and the bonds and mortgages covering the system should be extinguished as to such excess and applied to the lands and rights of the settlers and Woods, for their claims and liens can extend only to the acreage for which they furnish an adequate quantity of water.

The second inquiry then is: What should be the total area of the project? This should be determined from the total water contracts and other vested water rights now outstanding. One will have to confess from this confusing mass of testimony that it is a task to accurately ascertain the total acreage in the project for which water has been contracted for or is entitled to. However, from the stipulations made and the evidence concerning lands not included in the stipulations and which are entitled to water, it seems that the settlers and Woods are entitled to water from the system to irrigate 6,440 acres. This will necessitate the elimination of the acreage and water claimed by the investment and canal companies and the trustees.

### Woods' Rights.

The request is made by the plaintiff and certain defendants that all the lands held by Woods should be eliminated from the project and his claim of water rights extinguished and applied on the rights of the settlers. This contention is made upon the theory that Woods was the promoter who sold the water rights to the settlers, and therefore is responsible for selling to them more water than was available from the project. The evidence does not sustain such a conclusion, for, as has been said, the settlers were on the project under homestead and desert entries a long time before Woods became interested. Wickham had initiated the project, and some time thereafter in 1908 interested Woods to loan money to complete the system. The identical settlers or their predecessors in interest were then there. Woods loaned his money and purchased the lands he now claims by conveyances direct from the original entrymen or by redemption under the state law.

The lands in the project bear the entry numbers given at the time of its entry as Carey Act entries. The numbers correspond with the numbers of the Carey Act contracts with the irrigation company and with the numbers of stock certificates issued by the canal company to go with it. His lands are included within the area of 7,890 acres to which water was in 1918 limited by the state land board, and ever since then he has been in possession and farming it. The entry numbers of the 1,080 acres, which he owns and is entitled to water, are Nos. 7, 11, 12, 17, 34, 35, 50, and 59. As to entries Nos. 17, 34, 35, 50, and 59, totalling 680 acres, excepting entry No. 50, which was acquired by foreclosure proceedings and deed of the entryman, he acquired title by direct conveyance from the original entryman, and as to the remaining 400 acres, entries Nos. 7, 11, and 12, he acquired title by redemption under the state law. The evidence does not warrant the conclusion that his relationship with the project was either as a promoter or bondholder, nor that he was to derive any profit from the sale of water rights to the settlers or the issuance of the bonds. While he has advanced funds which were used in the construction and repair of the system, and has taken an interest in the completion of the system, yet he is no more connected with the project as a promoter than any settler, and is, as far as his water rights are concerned, on an equal footing with them. Neither does he claim, or has he any, interest in the irrigation, canal, or the investment companies, or the bonds other than any settler. To, under the evidence, eliminate and extinguish his lands and water rights from the system would be arbitrarily taking property from one who has an equal right with the settlers, and giving it to them.

### Settlers' Rights.

The acreage for which the settlers, other than Woods, are entitled to water and to share proportionately, is 5,360 acres, on the basis of 2 acre feet per acre.

### "Knollin" Water Right.

The evidence discloses that M. H. Woods, Mable Gilmore, John Dietrich, John Strope, and Henry Stauffer purchased from the Merchants' Trust Company the water right known as the "Knollin" water right of 640 inches of which the state district court decreed they were entitled to 459 inches thereof from Little Lost river at the point of diversion of the Blaine County Investment Company. This 459 inches is being conveyed through the system of the project under a right acquired by the owners of the 459 inches of water which is conveyed to their lands situate in the project. This 459 inches is held separate and apart from the waters of the other settlers by these five owners, and is not to be included in any prorating of the use of water among the settlers.

### Claims of Defendants and Cross-Complainants.

The contention of the defendants and cross-complainants seems to rest upon the determination of a reduction of the project. As the total area entitled to water from the project is found to be 6,440 acres which represent those who have established by the proof rights under their water right contracts, it would seem that, as far as the court's decision in the present case is concerned, there can be no determination as to the claims of the defendants and cross-complainants, as they are treated upon an equal footing and are to share proportionately in the water available for 5,000 acres.

The Columbia Trust Company and Cook, trustees, in their answer and cross-complaint, seek a foreclosure of the mortgage and deed of trust which covers the system and certain water right contracts of the settlers. Such foreclosure affects the rights of the settlers and their relationship to the system, and a decree may be rendered foreclosing the lien under the mortgage and trust deed if there is found due any amount thereon, after the taking of further testimony, upon the equity, if any, which the construction company may have in the uncollected balance on the water right contracts, as there is no unsold capacity in the system, and whatever improvements settlers may have made upon their lands where they have not received their full amount of water, of 2 acre feet per acre, at their headgates, they may have judgment for the costs of such improvements and damages

they may have sustained by reason of not receiving such full amount of water, upon the payment in full of their water right contracts, against the construction company, and the trustees are required to pay back to the settlers whose lands do not receive their full amount of water under their contracts, the amount which the trustees have collected from such settlers on the purchase price of water rights, and the trustees shall account further to them for any amounts they may have collected from each settler over and above the cost of 2 acre feet of water per acre provided for in their water contracts.

While there appears in the record some proof of uncollected balances on the settlers' contracts and collections by the trustee and costs of improvements, yet the record is very unsatisfactory in that respect, and that issue of fact will be referred back to the master to take further testimony and report to the court, and after that is done the court will then determine the issues thus presented and the foreclosure of the mortgage and trust deed.

The conclusions of the court may be summarized as follows: (a) That a receiver be not appointed at this time; (b) that the total area of land entitled to water from the system is 6,440 acres in the amount of 2 acre feet per acre to be shared proportionately of the 10,000 acre feet available from the system to irrigate 5,000 acres of land after deducting 459 inches of water allowed under the "Knollin" right; (c) that Woods is entitled to water for 1,080 acres of his lands, which is included within the 6,440 acres referred to in paragraph (b), and is to share proportionately in the 10,000 acre feet as therein mentioned after deducting the 459 inches of the "Knollin" right and deducting his proportion from said 459 inches; (d) that the "Knollin" water right of 459 inches belongs to M. H. Woods, Mable Gilmore, John Dietrich, John Strope, and Henry Stauffer separate and apart from the water rights of any others; (e) that the claims of the defendants and cross-complainants which rest upon the determination of a reduction of the project are without merit, as they are all on an equal footing with the rest of the settlers in sharing proportionately in the available water supply of the system; (f) that further evidence be taken, if the parties desire to present it, before a decree of foreclosure of the mortgage and trust deed be entered as above stated; and (g) each party pay his own costs.