NAMPA & MERIDIAN IRR. DIST. v. BOND, Project Manager, U. S. Reclamation Service (PAYETTE–BOISE WATER USERS' ASS'N, Limited, Intervener).

(District Court, D. Idaho, S. D. August 22, 1922.)

1. Waters and water courses ⬳231—Assessments based on cost of irrigation system as a whole.

An irrigation district assessment is based on the cost of constructing and maintaining the system as a whole in accordance with the benefits received by the individual units, but the basis of distributing costs is fixed once for all; not the cost of any single unit, but the cost of the entire system.

2. Waters and water courses ⬳231—"Operation and maintenance" of irrigation district includes cost of self-preservation of system.

The words "operation and maintenance," in the Reclamation Act, were used in a broad sense, and include the cost of self-preservation from ordinary and necessary incidents of operation, and not merely the maintenance of the status quo of the physical plant, and water users are subject to assessment for cost of drainage to protect a part of the land which would otherwise be injured by operating the system of irrigation.

In Equity. Suit by the Nampa & Meridian Irrigation District against J. B. Bond, Project Manager of Boise Project of the United States Reclamation Service, in which the Payette-Boise Water Users' Association, Limited, intervene. On motion to dismiss complaint. Motion allowed.

Hugh E. McElroy, of Boise, Idaho, for plaintiff.

E. G. Davis and B. E. Stoutemyer, both of Boise, Idaho, for defendants.

Eldredge & Morgan, of Boise, Idaho, for intervener.

DIETRICH, District Judge. In accordance with the expressed desire of the parties, the averments of the complaint are given a liberal construction, to the end that the merits of the controversy may be adjudged

upon the motion to dismiss, without the necessity of a trial more fully to disclose the particular facts.

1. Our discussion may be clarified by having at the outset a just understanding of the plaintiff's relation to the subject-matter of the suit. Whatever may be its formal legal status under its contract with the government, it is not the real party in interest. In practical effect it is but an intermediary, an agency, resorted to by the real parties in interest, for convenience, in the distribution of water and the collection of charges on account thereof. Back of it, as the real plaintiffs, are the project lands within its borders; they are the sole beneficiaries.

2. Originally these lands had precisely the same status as all other lands on the project.

3. This status was not materially altered by the contract between the district and the government. The contract concerns procedure, and relates to form rather than substance. It clearly discloses the intent of the parties thereto that in effect all project lands, both within and without the district, were to continue to be upon the same footing, sharing ratably in the benefits and burdens of the irrigation system.

[1] 4. While the facts are not expressly pleaded, it does appear in the record of the case, the decree in which plaintiff pleads and exhibits as a part of the complaint, and in the public reports of the Reclamation Service, that the cost of the drainage facilities constructed in the plaintiff district under the terms of the contract exhibited in the complaint (other than the part thereof allocated to old water right lands) was charged, not to the plaintiff lands alone, although they were the only lands protected thereby, but ratably to all the lands in the project. It is a further known fact that of the other project lands some are on the system above the plaintiff and others are below, and most of these lands could receive no benefit at all from such drainage facilities, and the others could be only slightly or indirectly benefited.

5. In fairness and equity, then, what can be said in defense of the position for which the plaintiff lands now contend? During the earlier part of the operation of the system, when they were threatened with destruction or injury from the rising ground water, they sought and were given protection by the construction of a drainage system, the cost of which was included in the general construction charge, and as such was, of course, ratably apportioned to all the lands in the project. Now, when, as a result of the further operation of the system, for their use and benefit, as well as for the balance of the project, other lands are menaced in the same way and from the same source, they seek to shift the entire burden of similar protective measures to the lands to be directly benefited. When they were threatened, they did not, as now, invoke the doctrine of assessment of benefits; at least, no such doctrine was recognized or applied in distributing the cost of the drainage facilities created for their protection.

6. Though there is no equity in the position, we are asked to sustain it because of certain considerations of technical law. In substance, as I understand it, the reasoning is that the plaintiff lands are in an irrigation district, that the charges must be collected by assessments under the state law, that before such assessments can be made there must be

an apportionment of benefits, and that the plaintiff lands are in no need of further drainage facilities and hence no benefits can be apportioned. But in so reasoning sight is lost of a fundamental characteristic of all irrigation systems constructed under either the state or the federal laws. Such a project is an indivisible unit, the burden of constructing and maintaining which is apportioned ratably to all lands receiving water therefrom. A water user cannot divide a system into its component parts, and decline to pay his share of the cost of constructing, of maintaining, or of operating those portions from which he receives no direct benefit. If a wasteway at the lower end of a system, or a drainage ditch, is essential to the lawful and efficient maintenance and operation of the system, it is properly to be regarded as a part of the system, and a water user near the head can no more consistently decline to pay his ratable share for its construction and maintenance than he could decline to pay for the lower portion of the main canal, or for laterals that do not serve his lands.

When the drainage ditches within the plaintiff district were constructed for the plaintiff lands, they were correctly treated as a part of the irrigation system, and quite as correctly their cost was distributed ratably to all the lands without consideration of the question of direct benefit. It follows that, by the apportionment already made in the district of the benefits of the system as a whole, pursuant to the state statutes, the basis of distributing cost has been fixed once for all; not the cost of constructing or maintaining any single unit, but the entire system, including every feature thereof, whether primary or auxiliary. It is the apportionment of the burden of constructing the entire project in accordance with the benefits received by the several tracts of land from the project as a whole.

[2] 7. There is the further contention that this is not a proper charge for "operation and maintenance." These terms are found both in the Reclamation Act, as amended, and the contract between the plaintiff district and the United States. They are of elastic and often indefinite import. In systems of accounting, especially of public service corporations, what should be entered as capital or construction, and what as operation and maintenance, is not infrequently a question of great difficulty, and is sometimes susceptible of only an arbitrary answer. If in strictness we undertake to apply the narrow view advanced by the plaintiff that the maintenance of an irrigation system is accomplished by "merely maintaining the status quo" of the physical plant, we are soon driven to absurdities. If a wooden headgate rots out, we could not replace it with one of concrete, though satisfied that in the long run it would be economy so to do. If there turns out to be excessive seepage in a section of the canal, it cannot be prevented by puddling or otherwise treating the canal to prevent waste, for that would be to change the status quo. If there is a break in the earth bank of the main canal on a hillside, however great the danger of a repetition of the break, and however prudent it would be to reinforce the earth with a concrete lining, thus insuring against future disaster, such a course would be to alter the status quo, and therefore could not be followed without putting into motion the complicated machinery required for raising money for

new construction work. Illustrations without number of the inadequacy and impracticability of such a view will readily occur to any one who has observed the operation of a large irrigation system, either at close range or from a distance. The government has fixed the construction charge upon this system, under the law, and it cannot now add to it without the consent of a majority of all of the water users. If, in the management of this great system, with its hundreds of miles of canals, its dams and gates, and a multitude of devices for diverting, impounding, carrying, and distributing water, it cannot in an intelligent way provide for new conditions, or in the light of experience make new and better provision for old conditions, by charging the reasonable expense thereof to maintenance and operation, the value and efficiency of the system would be greatly impaired. Surely such a result could not have been intended by Congress, or by the parties to the contract here involved. The terms "maintenance" and "operation" must have been used in a broader sense—a meaning perhaps not susceptible to precise and comprehensive definition, but none the less well understood.

True, the expenditure under consideration is relatively large, but it is to be borne in mind that it is to meet a condition which has gradually grown up as a result of the continued operation of the system. If each year there had been a collection and expenditure of an amount commensurate with the result of that year's operation, the case would present a different aspect, but would involve the same principle. By express admission the condition to be overcome is the direct result of operation, and is an incident thereof, and if the project is to be "maintained" the expenditure must be made. If in the course of operation the management incurred a liability for injury to land by flooding or for destruction of crops, undoubtedly the expense of discharging such a liability would be borne as an operating expense. May it not take the less expensive course of providing safeguards against such flooding and charge the expense thereof to maintenance and operation? With knowledge that the operation of the system without drainage facilities will inevitably swamp large areas of land, rendering the same worthless, and destroying the crops and trees growing thereon, must the plaintiff stand by until confronted with claims for damage?

Plaintiff frankly concedes that the condition against which the government seeks to provide is a direct result of operating its irrigating system. It also concedes that, while ground water is always a possible, if not a probable, contingency, drainage facilities to take care of it cannot safely be provided in advance, for there can be no intelligent prognosis of just where such waters will rise and do or threaten injury. If, however, the cost of such facilities is chargeable only to construction, the government is in this dilemma: Until it has completed its irrigation system and sold water rights, and has delivered water to supply them, it cannot include such cost in the cost of construction, for there are no possible data upon which to base an intelligent estimate of the amounts. But it must fix the "construction charge" before it can sell water rights. Hence such charge cannot be included in the construction cost as declared in the public notice, and the amount fixed in the public notice cannot thereafter be increased without the consent of

a majority of the water users. Whether such consent would ever be given even in a case of the most urgent need, if such need is not general, but only local, as is likely always to be true, is a question that may be referred for answer to the attitude of the plaintiff lands in the instant suit.

It is not thought that Congress could have intended that the terms "operation" and "maintenance" would be construed so strictly as thus to render the Reclamation Service impotent to protect the government investment and the interests of the settlers. A reclamation project is for the reclamation, and not the destruction, of lands, and it is expected that the reclaimed lands will return the investment and maintain the project as a going and fruitful concern. Here is an operation result highly injurious to the project. If the proposed protective measures are not taken, admittedly a large area of the project lands will be rendered worthless. If they are thus made worthless, they will not only be incapable of returning to the government their ratable and apportioned part of the construction cost, but they will also necessarily fail to carry any part of current maintenance and operation, and thus will be shifted their proper burden to the remaining lands on the project, including the plaintiff lands. But this is not all. If in principle the plaintiff's contention is right, it is equally applicable to a case where the ground water rises uniformly over the entire project, and threatens the destruction of all the lands at the same time. In such a case the project as a whole cannot be "maintained," but is to be destroyed, as a result of "operation," because an admittedly sensible expenditure, by which such self-destruction can be avoided, may not be charged as an expense of either operation or maintenance. In other words, the cost of self-preservation from an ordinary and necessary incident of operation is not chargeable to either maintenance or operation. To state the proposition is to reject it.

8. Finally, it is suggested that until recently it has been customary with the Reclamation Service to carry drainage as a part of construction. I do not stop to inquire touching the correctness of the statement. The facts are not expressly pleaded, and if, so far as concerns this project, we go to the sources from which the facts are to be gotten, we find that, at the time the drainage expenditures covered by the plaintiff's contract were made, the service also included in "construction" cost what are admittedly expenses of operation and maintenance; that is to say, during the long period prior to the giving of formal public notice the partially completed system was operated, and in the course of such operation large expenses were incurred over and above the rentals and other income for the same period, and this balance was covered into and charged against construction cost. It follows that a like disposition of the drainage expenditure has little interpretative significance.

It being thought that the proposed method of providing protective means, admitted to be necessary, against a menace, conceded to be the direct result of operating the system, is fair and equitable, and contravenes no statutory or contractual right, the motion to dismiss will be allowed.