UNITED STATES of America, Plaintiff,

v.

FORT BELKNAP IRRIGATION DISTRICT, Alfalfa Valley Irrigation District, Zurich Irrigation District, Paradise Valley Irrigation District, Harlem Irrigation District, Defendants.

Civ. No. 2162.

United States District Court
D. Montana,
Havre-Glasgow Division.

Sept. 14, 1961.

---

Moody Brickett, U. S. Atty., Butte, Mont., and Warren R. Wise, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

Burns & Thomas, Chinook, Mont., and Keller & Magnuson and Paul F. Reynolds, Helena, Mont., for defendants.

JAMESON, District Judge.

Plaintiff seeks recovery of sums expended in 1958 and 1959 for work on Sherburne Dam on Swiftcurrent Creek in northwestern Montana and an injunction against diversion of waters from Milk River by the defendants until they have paid charges assessed against them. Sherburne Dam is part of the Milk River Reclamation Project constructed and operated by plaintiff under the Reclamation Act of June 17, 1902 (32 Stat. 388), as amended. The defendants, comprising the Chinook Division of the Milk River Project, are irrigation districts organized under the laws of Montana. The primary question presented is whether under the applicable laws and contracts between plaintiff and defendants the work performed was "maintenance", as plaintiff contends, or "construction", as defendants contend.[1]

Most of the facts were stipulated and incorporated in a pretrial order. Supplemental testimony was presented at a trial beginning May 31, 1961. Exhaustive briefs have been filed by the respective parties.

The Milk River Project utilizes waters of Swiftcurrent Creek which come from the heavy snowfall in the high mountain basin which the creek drains. The water is stored behind Sherburne Dam, released into Swiftcurrent Creek and runs into St. Mary's River, where it is diverted, together with the natural flow of the river, through a canal into the North Fork of Milk River. It flows in that river 216 miles where it is stored by Fresno Dam. The defendant districts are located downstream from Fresno Dam. Each has a contract with the United States pursuant to which the waters of Swiftcurrent Creek and St. Mary's River, released from Fresno Dam, are diverted for irrigation of lands within the districts.

Sherburne Dam is an earth-filled structure, built between 1915 and 1919. After the concrete spillway was partially finished, it was discovered that the hillside to the left of the spillway was moving toward the spillway. Further work on the spillway was terminated while efforts were made to stabilize the hillside. These efforts were unsuccessful and the spillway was completed with timber rather than concrete as originally planned. Water was never discharged through the concrete and timber spillway. The cost of the spillway was approximately $299,-000.

The dam was designed to discharge water through cylinder gates located near the bottom and top of the outlet tower in the dam. Six slide gates were also installed in the outlet tower for emergency control. When the cylinder gates were first used in 1919, the lower gate did not close properly because gravel lodged between its stationary and movable parts. Concrete frame and oak sealing strips were installed in the gate in 1921 to keep out the gravel. The gate functioned without trouble until 1937, though it was cleaned out in 1932. The gate was difficult to operate in 1937 but gave no trouble in 1938. In 1939 difficulty again occurred, and in 1940 discharge had to be controlled by the emergency slide gates. The lower gate was dewatered and inspected in 1941 to determine the cause of the trouble. It was discovered that the oak seals installed in 1921 were missing and gravel was again preventing the gate from closing.

After 1941, until the recent work on the dam was completed, operation of Sherburne Dam was in this state: No spillway was available so the reservoir had to be filled without spills. To do this, the spring flood flow had to be predicted and the reservoir filled by regulating the discharge from the dam so that

1. Under Section 4 of the Reclamation Extension Act of August 13, 1914 (38 Stat. 687, 43 U.S.C.A. § 469), no increase in *construction* charges may be made except by agreement between the Secretary of the Interior and a majority of the water users. Under Section 5 of this Act, however (38 Stat. 687, 43 U.S.C.A. § 492), a water user must pay annually "an *operation and maintenance* charge based upon the total cost of operation and maintenance of the project."

the reservoir would be full when the flood flow ceased. The discharge of water from the dam had to be regulated by the emergency slide gates because of the condition of the lower cylinder gate. As added protection against spills, the reservoir was operated at 60,000 acre-feet capacity.[2]

The flood run-off in Swiftcurrent Creek was exceptionally heavy in the Spring of 1948. Sherburne reservoir rose to within four feet of the unusable spillway before the rate of inflow dropped back to the capacity of the outlet works. The heavy discharge of water through the slide gates at this time caused vibrations in the outlet gate tower.

A team of engineers inspected Sherburne Dam in the Fall of 1948 to determine what work delayed because of World War II was needed. They questioned whether those operating the dam could continue to predict spring flood inflow accurately enough to fill the reservoir without spills. They suggested that too many chances were being taken and recommended that the original spillway site be abandoned and an overflow spillway installed in the dam. They also recommended that the cylinder gates be placed in condition for operation at all times. A similar inspection in 1949 led to the same recommendations.

The old spillway was diked off to prevent spills through it when the Bureau of Reclamation decided in 1951 that the dam could be operated without a spillway if the practice of emptying the reservoir and filling it by prediction of spring flood inflow was continued. A six-foot gap between the top of the dike and the crest of the dam was left, however, in case of error in predicting the flood inflow or in determining the discharge required to prevent overtopping the dam.

The work on the dam in 1958 and 1959 consisted of the following:

| | |
|---|---|
| Replacement of the cylinder gates by high pressure gates, at a cost of | $137,411.48 |
| Repair of the eroded and abraded concrete areas within the outlet works, at a cost of | 63,218.60 |
| Installation of a glory-hole spillway in the outlet tower, at a cost of | 54,262.72 |
| Raising the dike cutting off the original spillway at a cost of | 32,793.21 |
| Total | $287,686.01 |

The Bureau of Reclamation sought an agreement from the defendant districts, as well as the Malta and Glasgow Districts of the Project, to repay their respective shares of these expenditures under the provisions of the Rehabilitation and Betterment Act of 1949.[3] None of

2. The dam had a capacity of 66,000 acre-feet.

3. 43 U.S.C.A. § 504 provides in pertinent part: "Expenditures of funds hereafter specifically appropriated for rehabilitation and betterment of irrigation systems on projects governed by the Federal reclamation laws * * * shall be made only after the organizations concerned shall have obligated themselves for the return thereof in installments fixed in accordance with their ability to pay, as determined by the Secretary of the Interior in the light of their outstanding repayment obligations, and which shall, to the fullest practicable extent, be scheduled for return with their construction charge installments or otherwise scheduled as he shall determine. * * * The term 're-habilitation and betterment', as used in this section, shall mean maintenance, including replacements, which cannot be financed currently, as otherwise contemplated by the Federal reclamation laws in the case of operation and maintenance costs, but shall not include construction, the costs of which are returnable, in whole or in part, through 'construction charges' as that term is defined in section 485a(d) of this title. * * * Oct. 7, 1949, c. 650, § 1, 63 Stat. 724, amended Mar. 3, 1950, c. 47, 64 Stat. 11." Section 485a(d) reads: "The term 'construction charges' shall mean the amounts of principal obligations payable to the United States under water-right applications, repayment contracts, orders of the Secretary, or other forms of obligation entered into pursuant to the Federal reclamation laws, excepting amounts

the defendant districts would agree to do so. The Commissioner then decided to proceed with the work as an ordinary maintenance cost. An estimate of the cost was approved by the Commissioner and Secretary of the Interior and transmitted to Congress. Funds were appropriated in the Public Works Appropriation Acts of 1959 (72 Stat. 1527) and 1960 (73 Stat. 491), 43 U.S.C.A. § 377a. Each defendant was then charged by the Bureau for its share of the cost under the provision of its contract obligating it to pay for the *maintenance* of Sherburne Dam.[4]

The Malta and Glasgow Irrigation Districts agreed to repay their shares of the cost of the work on Sherburne Dam under the provisions of the Rehabilitation and Betterment Act of 1949. Water from Sherburne Lakes Reservoir released from Fresno Reservoir for delivery to these two irrigation districts, and for delivery to other users downstream, must pass the points of diversion for defendant districts. These points of diversion are under the control of defendant districts. Although requested by the Bureau of Reclamation to comply with the provision of their contracts requiring surrender of control of their headgates when they are in default in payment of their maintenance charges, each defendant district has refused on the ground that it is not in default in payment of maintenance charges. Each likewise threatens to "resist any effort by the

United States to take control" of its point of diversion from the Milk River.

The parties have agreed that the issues of law are:

1. Whether the work done by plaintiff was maintenance or original or new construction within the meaning of the Reclamation Law, 43 U.S.C.A. § 371 ff, and the contracts between plaintiff and each of the respective defendants.

2. Whether the decision of the Secretary of the Interior that the work should be performed, the action of Congress in appropriating funds to pay for the work, and the allocation of the cost to the defendant districts by the Secretary of the Interior may be challenged judicially by defendant districts.

3. Whether the act of the Secretary of the Interior in authorizing the work and in charging the defendant districts with the cost thereof as a maintenance charge was arbitrary and capricious.

4. Whether the work performed was such as is contemplated and covered by the provisions of 43 U.S.C.A. § 504.

5. Whether any law of the State of Montana precludes defendant districts from levying charges adequate to pay for the work done on Sherburne Dam.

6. Whether defendant districts may and should be enjoined from diverting water from Milk River until they have paid the charges assessed to them as

---

payable for water rental or power charges, operation and maintenance and other yearly service charges, and excepting also any other operation and maintenance, interest, or other charges which are not covered into the principal sums of the construction accounts of the Bureau of Reclamation."

4. Contract provisions relied upon by the parties include: Article 10, which provides for payment of construction charges in 80 semi-annual installments and that the "total of the construction charge liability" shall not exceed a sum therein specified; Article 12, which provides for the payment by each defendant of its proportionate share of the annual ex-

penses incurred for "operation and maintenance" "as conclusively determined by the Secretary"; Article 14, which provides for the levy of assessments to meet the charges to come due to the United States under the terms of the contract; and Article 15, which provides that the construction charges are intended to reimburse the United States for its costs incurred to date and that "the United States is to make no further expenditures upon said portion of the project * * *" except for $83,000 estimated expenditures on the St. Mary's storage work or to the extent that $83,000 may be increased in accordance with Article 10.

maintenance under their contracts with the United States.

*Was the work performed "maintenance" or "construction"?*

■ Under Section 4 of the Reclamation Extension Act (43 U.S.C.A. § 469) no increase in "construction" may be made without the consent of the water users. Under section 5 (43 U.S.C.A. § 492) the water users must pay annually an "operation and maintenance" charge. In essence the same provisions are incorporated in the contracts between plaintiff and the respective defendants, articles 10 and 15 limiting construction charges to the amounts therein specified, and article 12 providing for payment of each defendant's proportionate share of the annual expenses for operation and maintenance, as conclusively determined by the Secretary.[5]

The distinction between "construction" and "operation and maintenance" charges was considered by the Supreme Court in Nampa & Meridian Irr. District v. Bond, 1925, 268 U.S. 50, 45 S.Ct. 383, 384, 69 L.Ed. 843. In that case appellant irrigation district, a public corporation organized under the laws of Idaho, entered into a contract with the United States to receive water from a government irrigation project then under construction. Costs of construction were fixed and charged ratably against the project lands. Later it became necessary to drain project lands outside the district, because they were being ruined for agricultural purposes by reason of seepage water from the system. The Secretary of the Interior authorized construction of the drainage system and prorated the cost against all the project lands as an operation and maintenance charge. Appellant district contended the charge was not properly an operation and maintenance charge but was an additional charge for construction which appellant could not be required to pay by reason of Section 4 of the Reclamation Extension Act (43 U.S.C.A. § 469). In holding that expense was chargeable to operation and maintenance, the court said:

"Section 4 of the Reclamation Extension Act, supra, prevents an increase in the *construction* charges to be imposed upon the water users without the consent of a majority of them after the amount thereof has been fixed. But this is far from saying that, after the completion of the irrigation system in accordance with the original plan in respect of which the construction charges were fixed, should the need arise to remedy conditions brought about by the *use* of the system, the government must bear the expense if a majority of the water users withhold their consent. Expenditures necessary to construct an irrigation system and put it in condition to furnish and properly to distribute a supply of water are chargeable to construction; but when the irrigation system is completed, expenditures made to maintain it as an efficient going concern, and to operate it effectively to the end for which it was designed are, at least generally, maintenance and operating expenses. The expenditure in question was not for extensions to new lands, or for changes in or additions to the system made necessary by faulty original construction in violation of contractual or statutory obligations (Twin Falls Co. v. Caldwell, [C.C.A.] [9 Cir.] 272 Fed. 356, 369; [Id.,] 266 U.S. 85, [45 S.Ct. 22, 69 L.Ed. 178]), but was for the purpose of overcoming injurious consequences arising from the normal and ordinary operation of the completed plant which, so far as appears, was itself well constructed. The fact that the need of drainage for the district lands, already existing or foreseen, had been supplied, and the cost thereof charged to all the water users as a part of the orig-

---

5. The government is bound by the provisions of the respective contracts to the same extent as the defendant districts.

United States v. Coachella Valley County Water Dist., D.C.S.D.Cal.C.D.1953, 111 F.Supp. 172.

inal *construction*, by no means compels the conclusion that an expenditure of the same character, the necessity for which subsequently developed as an incident of operation, is not a proper *operating* charge. The same kind of work under one set of facts may be chargeable to construction and under a different set of facts may be chargeable to maintenance and operation. See Schmidt v. Louisville C. & L. Ry. Co., 119 Ky. 287, 301, 302, 84 S.W. 314. For example, headgates originally placed are charged properly to construction; but it does not follow that if an original headgate be swept away, its replacement, though requiring exactly the same kind of materials and work, may not be charged to operation and maintenance."

The case of Twin Falls Salmon River Land & Water Co. v. Caldwell, 9 Cir., 1921, 272 F. 356; 266 U.S. 85, 45 S.Ct. 22, 69 L.Ed. 178, cited in the Nampa case, involved the determination of whether certain work was chargeable to construction or to operation and maintenance under a contract between the State of Idaho and appellant construction company for the construction of an irrigation system for lands to be opened for entry under the Carey Act. While the Reclamation Extension Act was not construed, analogous considerations were involved. There, a natural basin of about 90 acres in area directly below a dam was used by the construction company as part of its canal. Seepage developed through porous formations under the basin. A further loss of water was caused by the fact that the basin was lower than the bottom of its outlet, requiring the basin to be filled before any water was discharged into the system. When flow was shut off at intervals, that part remaining in the basin was lost through percolation and evaporation. When water was again turned on, it was necessary to refill the basin which in turn was wasted when the source was shut off. At the suggestion of the Commissioner of the General Land Office, a canal was constructed through this basin to eliminate the waste, and the cost was charged to maintenance. The commissioner had intimated that the construction would be a condition to the patenting of 35,000 acres. The court held the work was not properly a maintenance charge but was allocable to original construction in that (1) the basin was originally used instead of a canal for economy reasons; (2) the system could be operated without the canal; (3) one motive for the construction of the canal was the prospect of increased acreage and increased revenue; (4) there had been no substantial change in conditions for several years and no emergency had arisen; and (5) the original work did not measure up to the requirements of either the applicable statutes or the contract, and the additional work served only to remedy that deficiency.

■■ It seems clear from these cases that where expenditures are incurred (1) "to construct an irrigation system and put it in condition to furnish and properly distribute" water, or (2) where expenditures are made necessary by faulty original construction in violation of contract and statutory requirements, or (3) for the purpose of increasing the capacity of the original system, they are chargeable to "construction". Where an irrigation system is completed and expenditures are required "to remedy conditions brought about by the *use* of the system * * * to maintain it as an efficient going concern or to operate it effectively for the end to which it is designed" and to "overcome injurious consequences arising from the normal and ordinary operation of the completed plant", they are chargeable to "operation and maintenance".[6]

■ Was the work here performed made necessary by the operation and use of the irrigation system? The work

---

6. The plaintiff in its trial memorandum recognizes that the Nampa opinions indicate that "maintenance is an expenditure made to remedy a condition which has developed as a result of the use of the structure".

performed has been divided by the parties into four categories: (1) the replacement of the cylinder gates by high pressure gates; (2) repair of eroded and abraded concrete barriers within the outlet works; (3) installation of a gloryhole spillway in the outlet tower; and (4) raising the dike cutting off the original spillway. There is no contention that the work under the first two categories could not have been performed without doing the work in the two latter categories.[7]

Numerous engineering reports and recommendations between 1948 and 1950 include a proposal of the chief engineer of the Bureau of Reclamation, Denver, (Ex. 5) dated August 27, 1950, which concluded that, "Given intelligent operation of the reservoir, no spillway is necessary", and recommended "that the reservoir be so operated that no spillway is necessary, that a dike be built over the present spillway crest, and that the remaining concrete be covered with earth for the sake of appearance".[8]

By letter dated April 16, 1953, (Ex. 7) the chief engineer proposed substantially the work later performed in 1958 and 1959, again recognizing, however, that, "If past practices are adhered to and observed and intelligent operation of the reservoir is observed, no spillway is needed". It was noted that "the cylinder gates are not being used because they are not dependable, and reliance for outlet regulation is being placed only on the emergency gates".[9]

An inspection report dated November 16, 1953, (Ex. 8) noted that the spillway had been diked; that future releases would have to be made through the outlet works; that the lower cylinder gate was frozen open and impossible of being reset due to the abraded condition of the concrete; that the upper cylinder gate, however, was "well above the zone subjected to abrasion and is in good condition. It is not known if this gate has ever been used for regulation". The emergency slide gates were found to be in good condition and were being used to regulate all releases, full reliance being on these gates.

Bureau of Reclamation officials—Floyd E. Dominy, Commissioner of Reclamation, Frank M. Clinton, Director of Region 4, Oscar L. Rice, Chief Dams Branch, Division of Design, and Bruce Garlinghouse, Chief Irrigation Division, Upper Missouri Project Office—testified that the work performed was necessary for the continued safe and efficient use of the project facilities. Clinton testified that the "margin of safety" prior to the 1958–59 work was "very small" and that a greater margin of safety was necessary. Rice expressed the opinion that the work to repair the dam and facilities was needed to put them in "safe operating condi-

7. Oscar L. Rice, Chief of the Dams Branch of the Technical Center of the Bureau of Reclamation in Denver, testified on cross-examination that when consideration was first given to the work on the gates, the new spillway was not included; but, he stated, it was natural to bring the two problems together. Mr. Rice also admitted, and it is apparent from an inspection of the technical evidence presented, that the high pressure gate system and the new spillway are not functionally interdependent.

8. Prior reports in 1948 (Ex. 2) and 1949 (Ex. 3) had referred to the appearance of the dam to passing motorists and its proximity to the main highway to Glacier National Park.

9. The letter continued in pertinent part: " * * * With extreme vibrations an imminent failure of the outlet works tower under prolonged use during a flood becomes a possibility. We may be faced then not only with a nonoperating spillway but also with a damaged and inoperative outlet works. Our concern over an inoperable spillway should not outweigh apprehensions over an outlet works that does not function properly.

"A study has been made of the present outlet tower arrangement to see if improvements can be made to the structure which will ensure a more positive and dependable operation. Without too many modifications it appears that the structure may be converted into a combined spillway and outlet works, so that a failure of the outlet works gates would not preclude use of the structure as an emergency spillway. * * *"

tions". Clinton and Rice are both qualified engineers of extensive experience.

Dominy, Clinton and Rice expressed the opinion that all of the work performed was "maintenance" and not "construction", and that similar work on other projects had been considered maintenance.

Officials and water users representing the defendant districts testified that in their opinion the work performed was not necessary for the safe and efficient operation of the irrigation system and that any necessary repair of the gates could have been made at substantially less expense. They also testified that none of the defendant districts would benefit from the increase in capacity from 60,000 to 66,000 acre feet.

It is clear from all the evidence and the agreed facts that the original spillway was never used. Applying the standard of the Nampa opinion, it cannot be said that the construction of the new spillway was to "remedy conditions brought about by the *use* of the system". The original spillway, for which the defendant districts paid their proportionate shares of the cost of construction, was never made to function as originally designed. For more than 40 years, the irrigation system was operated without a spillway. No spillway was ever completed and none was ever used. The cost of the new spillway in the amount of $54,262.72 and raising the dike on the old spillway in the amount of $32,793.21 may not be charged to operation and maintenance. They are "construction" charges. The defendants, not having consented to any additional charge for construction, are not liable therefor.

■ A different situation is presented with respect to the replacement of the cylinder gates with high pressure gates and the repair of the eroded or abraded concrete areas. This work was performed as the result of the use of the dam. It is true, as counsel for defendants contend, that the cylinder gates were not worn out when they were replaced. Counsel concede, however, that they did not function properly without oak strips and the oak strips did wear out and the cement covering the oak strips became abraded. While the oak strips and cement could have been repaired at less cost, continued trouble could have been anticipated. The new gates provided a safer and more satisfactory and permanent installation.

While the cylinder gates did not function properly without the oak strips, it cannot be said that they constituted "faulty original construction". Mr. Rice testified that the use of cylinder type gates was considered to be "good construction" at the time they were installed, and that cylinder gates had been installed in Hoover and other dams. Nor is the Bureau now precluded from substituting a different type of gate of improved design and found from subsequent experience to be safer and more satisfactory.

■ While the government may not undertake new construction under the guise of maintenance and operation, it is not limited to repair of existing facilities or replacement with the same type of equipment or materials, if the Commissioner, in his sound discretion, determines that replacement with other equipment or materials of an improved type or design is advisable for the safe and satisfactory operation of the irrigation system. The government is not required to preserve the "status quo" where, by reason of advanced technology, better equipment and materials are available for necessary repairs and replacements.[10]

---

10. This was well expressed by the trial court in Nampa and Meridian Irr. Dist. v. Bond, D.C.1922, 283 F. 569, 571, affirmed 9 Cir., 288 F. 541; 268 U.S. 50, 45 S.Ct. 383, 69 L.Ed. 843, where the court said:

"If in strictness we undertake to apply the narrow view advanced by the plaintiff that the maintenance of an irrigation system is accomplished by 'merely maintaining the status quo' of the physical plant, we are soon driven to absurdi-

It is accordingly held that the charges for replacing the cylinder gates and repairing eroded and abraded concrete areas are properly chargeable as costs of operation and maintenance for which defendants are liable under their contracts and the applicable statutes.[11]

*May this court review the determination of the Commissioner (1) that the work performed was "maintenance"; or (2) that the work was necessary; and (3) his decision regarding the methods of conducting the work?*

While the Reclamation Act authorizes the Secretary of the Interior to perform any and all acts which may be necessary and proper for the purpose of carrying out the provisions of the Reclamation law,[12] there is no express provision in either the statutes or contracts that his determination that any particular work constitutes construction or maintenance shall be conclusive. It is true that under article 12 of the contracts his determination of the proportionate share of each district of the annual expenses incurred for "maintenance" shall be conclusive. This does not authorize him, however, to make such charges if the work in fact was construction rather than maintenance. Before new construc-

tion can be undertaken it is necessary to obtain an agreement from the water users to pay the cost.[13]

The determination of the question of whether the work performed was "construction" or "maintenance" involves the meaning of those terms as used in applicable statutes and contracts and as construed by the Supreme Court. While an administrative finding that particular work is "maintenance" will be accorded great weight by this court, it is not conclusive. "Administrative determinations must have a basis in law and must be within the granted authority."[14] In the final analysis statutory construction is a legal function, and the court may properly examine the construction of the administrative agency.[15]

It is significant that in the controlling case on what constitutes construction and maintenance, Nampa and Meridian Irrigation District v. Bond, supra, the Supreme Court did not base its decision on any determination of the Secretary, although the Court of Appeals had held that the determination of the Secretary was controlling on the court.[16] It is my conclusion that in determining that the new spillway and dikes were

---

ties. If a wooden headgate rots out, we could not replace it with one of concrete, though satisfied that in the long run it would be economy so to do. * * If there is a break in the earth bank of the main canal on a hillside, however great the danger of a repetition of the break, and however prudent it would be to reinforce the earth with a concrete lining, thus insuring against future disaster, such a course would be to alter the status quo, and therefore could not be followed without putting into motion the complicated machinery required for raising money for new construction work. * * * If, in the management of this great system, * * * it (the government) cannot in an intelligent way provide for new conditions, or in the light of experience make new and better provisions for old conditions, by charging the reasonable expense thereof to maintenance and operation, the value and efficiency of the system would be greatly impaired. Surely such a result could not

have been intended by Congress, or by the parties to the contract here involved."

11. Fox v. Ickes, 1943, 78 U.S.App.D.C. 84, 137 F.2d 30, upon which defendants strongly rely, is distinguishable. There a shortage of water had developed because of a dry cycle and an increase in the acreage under irrigation. To meet the shortage the Secretary of the Interior proposed the construction of a new reservoir. After failing to obtain the consent of the water users for the new construction, the Secretary sought to impose a rental, which was enjoined.

12. 43 U.S.C.A. § 373.

13. 43 U.S.C.A. § 470; Fox v. Ickes, 1943, 78 U.S.App.D.C. 84, 137 F.2d 30.

14. Social Security Board v. Nierotko, 1946, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718.

15. Miller v. Burger, 9 Cir., 1947, 161 F.2d 992.

16. 9 Cir., 1923, 288 F. 541.

"maintenance" the Commissioner has made an erroneous application of the law as set forth in the Nampa case.

On the other hand the necessity for the work and the methods of performance were within the sound discretion of the Commissioner. His determination on these questions is not subject to judicial review in the absence of a showing that his decision was fraudulent or so arbitrary, capricious, or grossly erroneous as to constitute bad faith.[17]

There is no substantial evidence to support any finding of fraud or that the determination of the Commissioner was so arbitrary, capricious or grossly erroneous as to imply bad faith. While the court might agree with defendants that the work could properly have been performed in another manner and at less expense, the court may not substitute its judgment in that regard for the determination of the Commissioner.

*What is the effect of the Rehabilitation and Betterment Act of 1949?*

As set forth supra (footnote 2) this Act provides that expenditures of funds specifically appropriated for the rehabilitation and betterment of irrigation systems shall be made only after the organizations concerned shall have obligated themselves for the return thereof in installments fixed in accordance with their ability to pay, as determined by the Secretary of the Interior. The Act further provides that the term "rehabilitation and betterment" as used in the section shall mean "maintenance, including replacements, which cannot be financed currently * * * but shall not include construction * * *".[18] Defendants contend that under this Act the plaintiff was not authorized to perform the work in question in the absence of an agree-

ment with the defendant districts. It is admitted that the defendants were unwilling to enter into any agreement obligating themselves for the payment of any of this work. The question then arises: In the absence of such an agreement, was the Commissioner authorized in proceeding under the provisions of the Reclamation Act and the contracts between the parties, if in fact the work performed was maintenance and not construction?

Both sides rely upon the legislative history in the enactment of the Rehabilitation and Betterment Act of 1949. The purpose of this legislation, as set forth in the Senate Report (H.R. 1694) reads in pertinent part:

"The purpose of this bill is to permit the repayment of rehabilitation and betterment costs of Federal reclamation projects to be scheduled in accordance with repayment ability of the water users.

"*H.R. 1694 would not authorize any work on reclamation projects since the performance of necessary maintenance is already authorized by law.* It merely authorizes the Secretary of the Interior to make the necessary repayment arrangements with the water users. (Emphasis supplied.)

"This legislation is needed to relieve an emergency situation existing on many of the older reclamation projects. Deferred maintenance work has accumulated because of the economic depression preceding World War II and because of the scarcity of material and labor during and immediately following World War II. Therefore, many reclamation-project facilities have deteriorated rapidly in recent years. Also, engineering techniques have improv-

17. See United States v. Ide, 8 Cir., 1921, 277 F. 373, 382, and cases there cited; Payette-Boise Water Users' Ass'n v. Cole, D.C., 1919, 263 F. 734. See also United States v. Wunderlich, 1951, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113.

18. Counsel for defendants call attention to the provision in 43 U.S.C.A. § 422b(a),

which is a part of the Act of August 6, 1956, c. 972, 70 Stat. 1044, that the term "construction" shall include "rehabilitation and betterment". Insofar as there may be any conflict between the provisions of this section and sections 504 and 485a(d), the latter would govern.

824

ed in recent years and extensive rehabilitation work is needed.

"The expense of major rehabilitation and betterment work is often beyond the immediate repayment ability of the water users. This bill will permit the Secretary of the Interior to extend the time within which repayment can be made." [19]

It is clear that it was not the intent of Congress in enacting this statute to limit the authority of the Secretary of the Interior with respect to work authorized by the Reclamation Extension Act then in force. Its sole purpose was to permit the Secretary to "make the necessary repayment arrangements with the water users".

The Bureau of Reclamation sought an agreement with all affected districts for repayment of the proposed work. In 1957 the Malta and Glasgow Divisions agreed that they would execute contracts to pay their proportionate shares under the Rehabilitation and Betterment Act.[20] The defendant districts, comprising the Chinook Division, declined to do so.

Each defendant was then notified by the Department of the Interior of the amount of its share of the estimated cost of the work to be performed in 1959 and 1960 and advised that at the option of the district and prior to December 31, 1958, the payments might be scheduled over a longer period under the Rehabilitation and Betterment Act. The defendants still refused to execute the contract, claiming that the work was unnecessary.

■ Funds were appropriated by Congress in 1959 and 1960.[21] The Subcommittee on Reclamation of the House Interior and Insular Affairs Committee was advised of the defendants' refusal to enter into contracts under the Rehabilitation and Betterment Act. While some members of the subcommittee were critical of the procedure followed, the funds were in fact appropriated by Congress as a part of the Bureau's budget for "operation and maintenance" and not specifically for rehabilitation and betterment pursuant to the provisions of 43 U.S.C.A. § 504.[22] The Bureau is not accordingly precluded from expending those funds

19. The report also quotes a letter dated April 12, 1949, from the Secretary of the Interior recommending the enactment of the bill, which reads in part:

"The enactment of legislation along the lines of the enclosed draft is not required to authorize the rehabilitation and betterment work in question, since that work is already authorized by law. It is required only to permit, in those cases where current financing of the necessary rehabilitation work is beyond the means of the irrigation water users, the deferral of payment therefor to the extent necessary. In other words, it would permit the repayment of those rehabilitation and betterment costs to be scheduled in accordance with the repayment ability of the water users."

Senate Report No. 501, June 14, 1949, 1949 U.S.Code Cong.Admin. & News, 81st Cong. 1st Sess., p. 2050.

20. Under the agreements subsequently executed, the payments were extended over a period of 30 years, at an annual cost of approximately ten cents an acre.

21. See 72 Stat. 1527 and 73 Stat. 491.

22. Commissioner Dominy submitted to the subcommittee an opinion of the Solicitor of the Department of the Interior to the effect (1) that the Commissioner had authority to seek and expend appropriated funds to carry out annual operation and maintenance when the Department had determined that the work was necessary for the proper function and safety of the project facilities; and (2) that maintenance "of the kind and scope required at Sherburne dam" might be undertaken pursuant to the Rehabilitation and Betterment Act and "the water users given the benefit of an extended repayment period in cases where current returns of such maintenance cost would be burdensome". He expressed the further opinion that agreements from all the project organizations would not be required; that the benefits of longer payment periods should be given effect only where the organizations had so agreed by contract; and that refusal on the part of one or more organizations to execute contracts "cannot frustrate or block performance of necessary maintenance work" or "avoid an obligation to return such costs currently under existing repayment contracts". Accordingly, he concluded that even with respect to funds appropriated for "operation and mainte-

and performing "maintenance work" without the defendants' consent.

*Does any law of the State of Montana preclude defendant districts from levying charges adequate to pay for the work done on Sherburne Dam?*

The defendants contend that the districts are precluded by Sections 89–1301 (5)[23] 89–1703(2), [24] and 89–1804,[25] R.C. M.1947, from levying assessments adequate to pay the charge to them for the work done.[26] Counsel have failed to cite, nor has the court found, any cases construing these or similar statutory provisions.

Section 89–1301(7) provides that the board of an irrigation district may enter into a contract with the United States "for the construction, operation, and maintenance of the necessary works for the delivery and distribution of water * * * under the provisions of the federal reclamation act and all acts amendatory thereof or supplemental thereto, and the rules and regulations established thereunder * * *". Where bonds of the district are not deposited, "it shall be the duty of the board of commissioners to include as part of any levy or assessment provided for in section 89–1801, an amount sufficient to meet each or all payments accruing under the terms of any such contract * * *". The board is authorized to accept appointment on behalf of the district as fiscal agent of the United States and in that capacity to collect moneys on behalf of the United States in connection with any federal reclamation project, and the board is granted power "to do any and all things required by the federal statutes" and any rules and regulations established pursuant thereto. Section 89–1801(1) provides that all payments due the United States under any contract between the district and the United States, where bonds have not been deposited, "shall be paid by revenue derived from a special tax or assessment" levied upon the lands of the district.

It will be noted that section 89–1804 (1) (footnote 25), relating to the annual levy, expressly provides that the board shall ascertain the total amount required for administrative expenses, including the cost of maintenance and repairs, *and the amount to be raised by any bonded or other indebtedness,* "including any indebtedness incurred under any contract between the district and the United

nance", there was no objection to extending to those organizations willing to contract the benefit of a longer payment of return of costs and that the benefit of the Act would not be limited to funds appropriated under the heading "construction and rehabilitation". Ex. 29A.

23. Section 89–1301(5) provides that no purchase, lease or contract for the purchase of any water, water rights, etc. for a price or rental in excess of $10,000 shall be final or binding upon the district, nor paid, without the written consent of a majority of the landowners within the district.

24. Section 89–1703(2) provides that no bonds shall be authorized or issued "and no contract shall be made with the United States" except upon petition signed by specified percentages of the landowners within the district. This section quite clearly is limited to authorization for the original bond issue or contract.

25. Section 89–1804(1) reads in pertinent part:

"(T)he board of commissioners of each irrigation district * * * shall ascertain the total amount required to be raised in that year for the general administrative expenses of the district, including the cost of maintenance and repairs, *and* the total amount to be raised that year for interest on and principal of the outstanding bonded or other indebtedness of the district, including any indebtedness incurred under any contract between the district and the United States accompanying which bonds of the district have not been deposited with the United States as in section 89–1301 provided * * *". (Emphasis supplied.)
Section 89–1804(3) provides that not more than $4 per acre "shall be levied in any one year on account of administrative expenses *and cost of maintenance and repairs* * * *".

26. The annual levy per acre is $3.40 in the Fort Belknap District; $3.50 in the Harlem District; $4.15 in the Paradise District; $4.50 in the Zurich District, and $5 in the Alfalfa District.

States" where bonds have not been deposited pursuant to section 89–1301. On the other hand, section 1801(3), prescribing the limitation of the annual levy, refers only to administrative expenses and cost of maintenance and repairs.

Section 89–1803 provides that, where a contract shall have been made with the United States, the lands within the district "shall pay in accordance with the federal reclamation laws and the public notices, orders, and regulations issued thereunder, and in compliance with any contracts made by the United States with owners of said lands; and in compliance further, with the contract between the districts and the United States * * ".

These sections are in harmony with the authorization contained in section 89–1807 to enter into contracts and to make assessments to meet the contractual obligations resulting therefrom, with no limitation therein prescribed. On the contrary, the board is granted full power to do any and all things required by the federal statutes and rules and regulations established pursuant thereto.

 The Montana statute does not contain any express limitation of the power of irrigation districts to levy and assess amounts required to perform the obligations of contracts entered into with the United States. In construing legislative provisions the statute must be considered in its entirety. Drake v. Schoregge et al., 1929, 85 Mont. 94, 277 P. 627. Considering these legislative provisions as a whole, it is clear that defendant districts are not precluded by Montana law from levying assessments adequate to meet their contractual obligations to plaintiff.

 *Should the defendants be enjoined from diverting water from Milk River until they have paid the charges assessed against them?*

In its original complaint and again by motion filed subsequent to trial, the plaintiff seeks (1) to enjoin the defendants from diverting Sherburne River water from Milk River as long as maintenance charges allocated to them remain unpaid; and (2) to require each defendant to transfer control of its headgates to plaintiff until its indebtedness to plaintiff is satisfied. The defendants contend that an injunction is unnecessary, in that the rights of the plaintiff are fully protected, and in the event of a final determination against the defendants, they will be required to pay the judgment in order to obtain water in the future.

In my opinion an injunction is unwarranted. The defendants are litigating their contentions in good faith. The findings of this court in part support defendants' contentions. It may well be that the defendants will seek an appellate determination of the findings in favor of the plaintiff. I agree with counsel for the defendants that the rights of the plaintiff are fully protected and that any final judgment in its favor will have to be paid.

Moreover, the testimony of Commissioner Dominy before the House Subcommittee strongly implies that the defendant districts would still be permitted to take advantage of the benefits of the Rehabilitation and Betterment Act and have an opportunity to "accept a more lenient payout" even after a determination of the controversy between the parties.[27] It is my conclusion that the defendants

27. At the hearing before the subcommittee Mr. Dominy testified in part:

"Mr. Dominy. The issuance of the notice, as last year, is carefully worded to point out that if the rehabilitation and betterment contract is adopted and they accept it, the notice would be set aside and they could pay over the longer period. We are issuing the notice only because we have to protect ourselves under the requirements of the existing contract. But the opportunity for them to accept the more lenient pay-out will still be available, even though the notice is issued, because we so provide right in the notice.

"Mr. Anderson. So the summary of what we have just been discussing is that they can continue to fight as long as they have a chance of success, and when the time comes, the seven, assuming the oth..

should be given a further opportunity to negotiate a repayment contract under this Act with respect to any amount finally determined to be due plaintiff as maintenance charges.

Plaintiff will prepare, serve and file draft of judgment pursuant to Rule 11 (b) of the local rules of court.

er five went along, would have similar contracts?

"Mr. Dominy. That is right sir." (Ex. 29A)

Notices were sent in March, 1959, specifying payments due on December 31, 1959, and June 30, 1960, stating that at the option of the defendant districts, the repayments might be scheduled over a longer period, pursuant to the Rehabilitation and Betterment Act of October 7, 1949, as amended, and that by April 1, 1959, "the procedures prescribed by the Rehabilitation and Betterment Act of 1949 will have been complied with so that the government will be in a position to execute a rehabilitation and betterment contract".